Revised August 26, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30683
_____


In The Matter Of:  CAJUN ELECTRIC POWER COOPERATIVE,
INCORPORATED,

                    Debtor.

--------------------------

RALPH R. MABEY, Chapter 11 Trustee for Cajun Electric
Power Cooperative Inc; LOUISIANA GENERATING LLC; TRITON
COAL COMPANY; WESTERN FUELS ASSOCIATION, INC; ENRON
CAPITAL AND TRADING RESOURCES INC; AMERICAN COMMERCIAL
MARINE SERVICE COMPANY; UNITED STATES OF AMERICA; RURAL
UTILITIES SERVICE,

                    Appellees,

v.

SOUTHWESTERN ELECTRIC POWER COMPANY; THE COMMITTEE OF
CERTAIN MEMBERS OF CAJUN ELECTRIC POWER COOPERATIVE,

                    Appellants.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
_____
August 11, 1998
Before KING, SMITH, and PARKER, Circuit Judges.

KING, Circuit Judge:

    Appellants Southwestern Electric Power Company and the

Committee of Certain Members of Cajun Electric Power Cooperative,

1

Inc. appeal the district court's order reversing the bankruptcy court's denial of a motion of appellee Ralph R. Mabey, Chapter 11 trustee of Cajun Electric Power Cooperative, Inc., seeking the disgorgement of certain payments made by Southwestern Electric Power Company to the Committee of Certain Members and a declaration that these payments rendered the plan of reorganization proposed by the appellants unconfirmable as a matter of law.  For the reasons set forth below, we reverse.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Overview of the Bankruptcy and Proposed Plans

Cajun Electric Power Cooperative, Inc. (Cajun) is a non-profit rural electrical power cooperative that filed a petition seeking reorganization under Chapter 11 of the Bankruptcy Code on December 21, 1994.  The Cajun case is a mega-case with more than $5 billion in debt and over seven hundred creditors.  Cajun has twelve members, all of which are electric distribution cooperatives serving retail customers in the State of Louisiana.  After extensive litigation regarding the propriety of the appointment of a bankruptcy trustee, this court approved the district court's appointment of Ralph R. Mabey (the Trustee) as Cajun's Chapter 11 trustee.  See Cajun Elec. Power Coop., Inc. v. Central La. Elec. Coop., Inc. (In re Cajun Elec. Power Coop., Inc.), 74 F.3d 599 (5th Cir. 1996).

With the approval of the bankruptcy court, the Trustee

2

conducted a remarkably fruitful "auction" that led to the submission of three competing plans of reorganization: one proposed by the Trustee, incorporating an offer to purchase Cajun's non-nuclear assets by Louisiana Generating LLC (Generating)[1]; another proposed by Enron Capital & Trade Resources Corp. (Enron) and the Official Committee of Unsecured Creditors; and another proposed by Southwestern Electric Power Company (SWEPCO) and the Committee of Certain Members (CCM), an unofficial committee which initially included ten of Cajun's twelve member cooperatives. We refer to these plans as the Trustee's Plan, the Enron Plan, and the SWEPCO Plan, respectively.

Each of the three plans before the bankruptcy court requires the sale of Cajun's non-nuclear assets to one of the respective proponent-bidders and the continued retention of Cajun's members as customers. The Trustee's Plan and the Enron Plan propose to retain Cajun's members as customers through assumption of the existing power-supply agreements between the members and Cajun (the All-Requirements Contracts) pursuant to 11 U.S.C. § 365. The SWEPCO Plan proposes to retain Cajun's members as customers through voluntarily negotiated new power-supply agreements.

---

[1] Generating is jointly owned by Zenergy, Inc.; NRG Energy, Inc.; and Southern Energy-Cajun, Inc. Zenergy, Inc. is a wholly-owned subsidiary of Zeigler Coal Holding Company, which is also the parent of Triton Coal Company, one of Cajun's major creditors and suppliers.

3

Significant for this appeal, all three of the plans also provide for reimbursement of certain of the members' expenses in connection with the bankruptcy case.

## B. Payments by SWEPCO to the CCM

Sometime prior to November 12, 1996, the date that the bankruptcy court approved all disclosure statements of the plan proponents, SWEPCO offered to pay certain legal fees of the CCM in connection with pursuing the SWEPCO Plan and in connection with an adversary proceeding initiated by the CCM in which it sought a declaration that the All-Requirements Contracts are void or assignable only to a party of the CCM members' choosing. This offer is evidenced by a memorandum written by David Kleiman, who at the time was the CCM's attorney, to the CCM members, which provides as follows:

> I previously advised you that SWEPCO had offered to subvent certain expenses of the Members Committee. Attached is their formal proposal to do so. The only condition is that the members will reimburse SWEPCO if we support another Plan. This seems fair. If we decide to support another Plan, we can negotiate for that Plan proponent to reimburse our expenses. Please indicate your acceptance or rejection of this proposal.

Attached to the memorandum was an unsigned draft letter from SWEPCO's counsel dated November 12, 1996, stating the following:

> . . . [T]he Members Committee (hereinafter referred to as "Members") and SWEPCO have mutual and joint interests in pursuing the Joint Plan of Reorganization and Members' adversary proceeding. The pertinent contract issues . . . will be prominent issues throughout the confirmation process. Based upon the significance of these legal issues to our Joint

4

Plan and in light of the substantial costs continuing to accrue as a result of the Members pursuing these legal issues, SWEPCO is prepared to assist the Members by subvention of certain costs associated with these efforts. The following is a suggested approach, subject to our joint approval.

First, SWEPCO has previously offered to reimburse the Members for expenses in the reorganization of up to $1 million, payable solely in the event our Plan of Reorganization is successful. This offer remains in force and effect.

On a monthly basis, SWEPCO also offers to pay the percentage set forth below of specified reasonable fees and expenses incurred by the Members Committee in connection with the confirmation and adversary proceeding. SWEPCO suggests that the payment be limited to 50% of the reasonable expenses of [the CCM's legal fees incurred beginning in September 1996]. In addition to these costs and expenses, SWEPCO would agree to pay for any expert witnesses jointly approved in advance. The Members may retain any expert they desire, at the Members' expense.

This agreement recognizes that the Joint Plan is in the best interest of the Members, SWEPCO and the ratepayers and the purpose of this agreement is to jointly support our Plan of Reorganization. In the event the Members abandon the exclusive support of the Joint SWEPCO/Members[] Plan, then the Members will reimburse SWEPCO all of said costs paid by SWEPCO pursuant to our agreement within 30 days of written notice from SWEPCO. SWEPCO's commitment may be terminated in SWEPCO's sole discretion by SWEPCO providing the Members written notice and SWEPCO's obligation to pay shall continue up to the date of written notice. The Members have no reimbursement obligation in the event of termination by SWEPCO, other than the obligation to reimburse SWEPCO in the event of abandonment of the exclusive support of the Members/SWEPCO[] Plan.

The record does not reflect that any of the CCM members accepted this offer.

On November 12, 1996, the bankruptcy court approved a master

5

disclosure statement drafted by the Trustee discussing Cajun and the reorganization in general as well as a supplemental disclosure statement from each plan proponent. SWEPCO's supplemental disclosure statement contains a section styled "Summary of Transactions to Occur Outside the Plan," which provides in pertinent part as follows:

> In addition, SWEPCO and the Members have agreed that, in the event the Plan is confirmed and consummated, as soon as practicable after the closing of the transaction whereby [SWEPCO's affiliate] acquires the Acquired Assets, SWEPCO shall reimburse the Members that are constituents of the Members' Committee for their reasonable attorneys fees and expenses incurred in this bankruptcy proceeding, not to exceed $1 million in the aggregate. In addition, SWEPCO may agree to pay certain expenses of the Members Committee in regard to certain litigation and the plan confirmation process.

By the December 6, 1996 voting deadline, the CCM members had voted overwhelmingly for the SWEPCO Plan and the Enron Plan and overwhelmingly against the Trustee's Plan. The vast majority of the CCM members listed the SWEPCO Plan as their first preference and the Enron Plan as their second preference; the Trustee's Plan received no preferential support from the CCM members. Confirmation hearings before the bankruptcy court began on December 16, 1996. That week, Southwest Louisiana Electric Membership Corporation (SLEMCO) and Pointe Coupee Electric Membership Corporation (Pointe Coupee), two members of the CCM, announced in open court that they wished to withdraw their support of the SWEPCO Plan and to change their vote and

6

preference to the Trustee's Plan.  Concordia Electric Cooperative, Inc., another CCM member, shortly followed suit. Thereafter, the CCM was reconstituted to include only seven members.

On January 2, 1997, SLEMCO filed a motion to disqualify David Kleiman and his law firm, which had represented the CCM members throughout the bankruptcy, because of a conflict of interest based upon Kleiman's prior representation of SLEMCO.  On January 7, 1997, the bankruptcy court granted SLEMCO's motion.

On the evening of January 7, 1997, SWEPCO's president, Mike Smith, met with the CCM members who had not withdrawn support for the SWEPCO Plan and offered to pay them $1 million in two $500,000 installments, one of which was payable immediately.  The terms of the payments were set forth in a letter dated January 9, 1997 from SWEPCO's counsel to David Kleiman that provided in relevant part as follows:

> In light of the action by SLEMCO wherein the Members must now seek other bankruptcy counsel, the Members and the Members' Committee will incur very substantial transition costs.  This will not only require that new bankruptcy counsel spend substantial time in reviewing this long-standing and complicated case, but that your firm take all steps necessary for there to be an orderly and effective transition.  These additional costs impose an even greater burden on the cooperatives.  In order to assist the Members in paying expenses previously incurred in this bankruptcy proceeding and particularly, for expenses to be incurred during the transition, SWEPCO has agreed to pay and/or reimburse the Members $1 million.  These funds will be provided in two equal payments with the first payment provided immediately after receipt of the required agreements by the participating cooperatives

7

and the second payment within approximately one month. These funds will be provided to the Members' Committee and the Members' Committees [sic] will distribute the funds as determined appropriate by the Committee.

One other proponent has offered to reimburse each of the Member cooperatives expenses. In the event any Member supports another plan or receives reimbursement from any other proponent, then the Member cooperative agrees to promptly reimburse SWEPCO for the respective expenses paid by SWEPCO and received by such Member. The cooperative also agrees to use its best efforts to obtain reimbursement from any other proponent, in the event the said cooperative elects to endorse another plan.

SWEPCO acknowledges and agrees that the Members and SWEPCO must and will continue to act in the best interest of their respective ratepayers and Members. We recognize the ongoing financial pressure that has been applied to the Members, particularly in light of the removal of counsel and the incurrence of transition costs, and this offer is intended to address these concerns and allow the parties to continue to pursue the serious bankruptcy issues.

I would appreciate it if each Member would acknowledge their agreement to the terms and provisions contained herein in writing via separate correspondence. This agreement is confidential and shall not be disclosed to any third parties without the mutual consent of the parties or as required by law.

Some, but not all, of the letters sent out to the CCM members contained a footnote, added at the direction of Kleiman, at the end of the second paragraph quoted above that provided as follows:

However, in the event of an adverse court ruling such that the SWEPCO/[]Members Committee Plan is not selected, but rather a different Plan is selected and that Plan proponent does not reimburse the Members' attorneys' fees and expert fees, the Members will not have to reimburse SWEPCO.

On January 9, 1997, Kleiman also sent a memorandum to the

8

CCM members stating the following:

> You will recall that [SWEPCO] committed to a payment to
> the seven (7) Members that continue to support SWEPCO
> in the total sum of $1 million.  The only condition is
> that the Members will use their best efforts to have
> that amount repaid in the event that they support a
> different plan proponent at some date in the future.

On January 16, 1997, Kleiman faxed to SWEPCO's counsel the consent forms whereby the CCM members accepted the terms of the January 9, 1997 letter.  The consent forms were accompanied by a letter from Kleiman to SWEPCO's counsel stating Kleiman's understanding that the January 9, 1997 letter agreement was to be modified by adding the following text to the end of the paragraph in the letter where Kleiman had previously requested the addition of the footnote discussed above:

> In the event of an adverse court ruling such that the
> SWEPCO/[]Members Committee Plan is not approved by the
> court, but rather a different plan is approved by the
> court, and the plan proponent does not reimburse the
> Members' attorneys fees and expert fees, the Members
> will have no obligation to reimburse SWEPCO.  Likewise,
> in the event that no plan is confirmed, then in such
> event the Members shall have no obligation to reimburse
> SWEPCO.

David Shaw, the president of the board of Washington-St. Tammany Electric Cooperative, Inc., one of the remaining CCM members, later informed Jimmy Ewing, Pointe Coupee's president, about the payments.  Thereafter, on April 17, 1997, SWEPCO and the CCM filed with the bankruptcy court a "Joint Report on Certain Transition Payments to the Committee of Certain Members" stating that the payments were made to defray certain legal

9

expenses, particularly in light of Kleiman's disqualification, and indicating that the payments were "essentially [an] accelerat[ion]" of the $1 million post-confirmation payment described in SWEPCO's supplemental disclosure statement.

On April 21, 1997, SWEPCO filed with the bankruptcy court term sheets signed by SWEPCO and the CCM members setting out the terms and provisions to be included in a wholesale power-supply agreement between Southwestern Wholesale Electric Company (SWECO), an affiliate of SWEPCO, and the CCM members.  Paragraph VI.A of the term sheets provided as follows:

> SWEPCO agrees to support the Joint Member/SWEPCO Plan, as the same may be modified or amended by mutually agreeable changes that do not alter the Joint Members/SWEPCO Plan in material respects ("Joint Plan"), through the confirmation hearing process and to provide wholesale power to the Members pursuant to the terms and provisions set forth hereinabove upon confirmation and the effective date of the Joint Plan, subject to the terms and conditions set forth in the Asset Purchase Agreement and Joint Plan, as long as a majority of the Members (measured by numbers of customers) support the Joint Plan.  The members agree to continue to exclusively support the Joint Plan, subject to the Bankruptcy Code and Rules, through the confirmation hearing process and, if the Joint Plan is confirmed, then, at the effective date of the Joint Plan, to enter into a Power Supply Agreement with SWECO, pursuant to the terms and conditions set forth hereinabove, as such terms may be modified or amended, and including other conditions and terms agreed to by the parties.  The members may elect to discuss provisions of a wholesale power supply agreement with third parties; however, the Members, subject to the Bankruptcy Code and Rules, shall not agree to enter into a Power Supply Agreement with any other person or persons unless or until an order is issued i) denying confirmation of the Joint Plan; ii) confirming a plan proposed by another plan proponent; or iii) expressly authorizing support of another plan that has been

10

materially amended from its current version.

Additionally, Paragraph V.C of the term sheets set forth the
following agreement regarding cost reimbursement:

> SWEPCO and the Members have reached an agreement on
> certain transitional cost reimbursement provisions as
> set forth in [the letter of SWEPCO's counsel] to Mr.
> Kleiman dated January 9, 1997; and this agreement is
> currently being implemented. SWEPCO will reimburse the
> Members fifty (50%) of reasonable bankruptcy counsel
> litigation expenses (expenses of Altheimer & Gray and
> Dann, Pecar, Newman & Kleiman) and expert expenses
> incurred in support of the Joint Plan, on a monthly
> basis, beginning January 1, 1997. In the event the
> SWEPCO Plan is confirmed, SWEPCO also agrees to
> reimburse the cooperatives for reasonable outstanding
> bankruptcy litigation and expert expenses incurred in
> support of the Joint Plan up to the total cumulative
> sum (for all past or future payments) of $5,000,000,
> which sum may be increased pursuant to mutual
> agreement.

### C. Litigation Regarding the Payments

On April 18, 1997, the Trustee filed a response to the Joint
Report and a combined motion and memorandum seeking denial of
confirmation of the SWEPCO Plan and/or disgorgement of the
payments that SWEPCO made to the CCM. In his motion, the Trustee
claimed that SWEPCO's payments to the CCM were not adequately
disclosed prior to being made and violated 11 U.S.C.
§ 1129(a)(4)'s requirement that

> [a]ny payment made . . . by the proponent [of a plan of
> reorganization] . . . for services or for costs and
> expenses in or in connection with the case, or in
> connection with the plan and incident to the case, [be]
> . . . approved by, or subject to the approval of, the
> court as reasonable.

11 U.S.C. § 1129(a)(4). The Trustee additionally argued that the

11

payments violated § 1129(a)(1), (2), and (3) of the Bankruptcy Code because they resulted in discrimination amongst creditors and circumvented the "Bankruptcy Code's provision respecting the rights of secured creditors and the priority of payments to creditors established by the Code."

The bankruptcy court conducted a hearing on the Trustee's motion during which it heard six days of testimony from sixteen witnesses and received eighty exhibits into evidence. Representatives of the remaining CCM members, as well as SWEPCO's president, testified that, as they understood the agreement between SWEPCO and the CCM members, the only condition that SWEPCO placed upon the two $500,000 transition payments was that the CCM members would be required to return the funds in the event that another plan was confirmed and they received reimbursement from the proponent of the confirmed plan.

On September 3, 1997, the bankruptcy court issued a detailed oral ruling denying the Trustee's motion. The bankruptcy court made the following findings of fact that are germane to this appeal:

> As early as November 16, 1996, SWEPCO and the committee were conducting negotiations with respect to reimbursement of fees and expenses, which negotiations the Court found within the certain expenses referred to in the second sentence of the disclosure statement. I believe this was of the subject of Mr. Klieman's [sic] memorandum to the Members on that date,[2] which

---

[2] The bankruptcy court's reference to the date of this memorandum indicates that it intended to say that SWEPCO and the

12

transmitted SWEPCO's offer with respect to fees.

At the Hilton meeting on January 7, Mr. Smith, SWEPCO's president, for the first time suggested an immediate $1 million payment. He testified that the payment was made to assist the members in their ongoing struggle for confirmation of the SWEPCO and Members plan. The evidence is overwhelming that the $1 million payment, by whatever name you choose to call it, was generally made without strings attached. There is no credible evidence which suggests otherwise. The only requirement was that the funds would be repaid to SWEPCO in the event that the following happened, another plan was confirmed and the Members received reimbursement under the confirmed plan. The members also agreed to use their best effort to negotiate expense reimbursement, as a successful plan proponent.

The question was asked of several witnesses, including Mr. Smith, what did SWEPCO get for their $1 million. The answer was generally uniform, nothing. The Court believes, though, that while there was nothing specific that SWEPCO either asked for or was promised, surely they anticipated that the money would not be used in order to benefit either of the competing plans of Enron or Louisiana Generating, but would, in some way, further SWEPCO's chances of success. I do not find this to be inappropriate. The fact is that SWEPCO was and is a major player in this Chapter 11 case. Mr. Smith was in court when the Dan Pecar firm [Kleiman's firm] was disqualified, and he saw the impact of the decision on the joint confirmation effort of SWEPCO and the Committee. There was no testimony whatsoever that the payment had been discussed or even contemplated prior to January 7. The Court finds the payment to be as characterized by SWEPCO, and that is a transition assistance payment.

To be sure, allegations of vote buying have surfaced with respect to this payment. At the time the payment was conceived and when it was made, however, the votes were already in. The ballots were filed in early December 1996. Each member had already voted for the SWEPCO plan. As stated earlier in the terms of the letter of Mr. Gilliam [SWEPCO's counsel] of January 9,

_____

CCM had been conducting negotiations regarding reimbursement of fees and expenses as early as November 13 rather than 16.

13

clearly indicate that the payment did not lock in any of the members. They were free to meet and negotiate. In fact, they did.

A complaint was further made that SWEPCO did not disclose the payment to the Court until the Trustee learned of the payment in early April and forced SWEPCO to make the disclosure. The Court finds that while the negotiations between SWEPCO and the committee were deemed confidential at the time, there was at all times an intent to make disclosure of the payment at an appropriate time. This is clearly borne out by reference to the draft of the term sheet originally dated in February 1997. The Court further concludes that the second sentence in the SWEPCO disclosure statement placed all parties on notice of the possibility of the payment of additional funds may be negotiated. And I do not believe that this second sentence of the disclosure statement should be narrowly construed.

In late April 1997, SWEPCO and the committee, the reconstituted committee, caused to be filed with the court a term sheet executed by the parties. There was, in Paragraph 5, language under the phrase "additional terms," additional language with respect to fee and expense reimbursement. And I believe that the inclusion of this language in that agreement was merely the culmination of the months of negotiation between SWEPCO and the committee.

The Trustee and others point to a lock-in which was contained in Paragraph 6 of the term sheet, entitled "Agreement and Obligations of the Parties," requiring Members to exclusively support the joint plan. . . . I do not find, however, that the provisions of Paragraph 6 of the term sheet suggest that any violations or any lock-in has occurred.

The bankruptcy court went on to hold that the payments were subject to § 1129(a)(4) but that § 1129(a)(4) did not require the court's approval of the payments prior to their being made. It therefore ordered SWEPCO and the CCM to file an application "seeking nunc pro tunc approval of the payment[s]." It further

14

ordered SWEPCO to make no further payments to the CCM or its members unless and until the court found the previously made payments reasonable. Pursuant to the bankruptcy court's instructions, on October 2, 1997, SWEPCO and the CCM filed such an application. The bankruptcy court denied the application without prejudice on March 17, 1998. On April 15, 1998, SWEPCO and the CCM filed a renewed application, which remains pending before the bankruptcy court.

The Trustee sought leave of the district court to appeal the bankruptcy court's denial of his motion, and the district court granted permission to appeal. On appeal, the district court held that the bankruptcy court erred in concluding that (1) SWEPCO's supplemental disclosure statement adequately disclosed its payments to the CCM and (2) the payments were not conditioned upon the CCM's exclusive support of the SWEPCO Plan. On this basis, the district court concluded that the payments violated 11 U.S.C. § 1129(a)(4) because SWEPCO failed to obtain prior approval of the payments from the bankruptcy court and the payments were made to lock in votes, § 1125 because SWEPCO had failed to fully disclose the payments, § 1123(a)(4) because the payments constituted discriminatory treatment of creditors within the same class, § 1129(b)(2)(B) because the payments violated the absolute priority rule, and § 1129(a)(3) because the payments and their concealment were improper and constituted bad faith. The district court therefore ordered "disqualification" of the SWEPCO

15

Plan on the ground that it is unconfirmable as a matter of law[3] and ordered disgorgement of the funds paid by SWEPCO to the CCM members.  SWEPCO and the CCM appeal these orders.  On July 10, 1998, we stayed the district court's orders.  Convinced that prompt confirmation of a plan by the bankruptcy court is of utmost importance to all parties in interest, we expedited this appeal, obtained full briefing, heard extended oral argument by the parties on August 4, and now render our decision.

## II.  STANDARD OF REVIEW

This case revolves around whether SWEPCO's payments to the CCM violated various provisions of the Bankruptcy Code.  Based on a series of findings of fact and conclusions of law, the bankruptcy court decided that they did not.  In holding that the

---

[3] We presume that, in determining that SWEPCO's purported violation of § 1125 barred confirmation of the SWEPCO Plan, the district court was relying upon either § 1129(a)(1), which provides that a plan may not be confirmed unless "[t]he plan complies with the applicable provisions of [Title 11]," or § 1129(a)(2), which provides that a plan may not be confirmed unless "[t]he proponent of the plan complies with the applicable provisions of [Title 11]."  See Mickey's Enters., Inc. v. Saturday Sales, Inc. (In re Mickey's Enters., Inc.), 165 B.R. 188, 193 (Bankr. W.D. Tex. 1994) ("In order to confirm a plan the court must find that the plan and its proponent have complied with the applicable provisions of Title 11.  One of those applicable provisions is § 1125 which requires disclosure of 'adequate information'." (citations omitted)).  We likewise presume that, in determining that SWEPCO's purported violation of § 1123(a)(4) barred confirmation of the SWEPCO Plan, the district court was relying upon § 1129(a)(1).  See H.R. REP. NO. 95-595, at 412 (1977) ("Paragraph (1) [of § 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as section 1122 and 1123, governing classification and contents of plan."), reprinted in 1978 U.S.C.C.A.N. 5963, 6368.

bankruptcy court erred in so deciding, the district court made a series of legal conclusions which we review de novo. In addition, the district court, either explicitly or implicitly, determined that certain of the bankruptcy court's fact-findings were clearly erroneous. The district court's determination that certain fact-findings of the bankruptcy court were clearly erroneous itself constitutes a conclusion of law which we also review de novo. See Anderson v. City of Bessemer City, 470 U.S. 564, 577-78 (1985); In re Sublett, 895 F.2d 1381, 1384 n.5 (11th Cir. 1990). That is, we make an independent assessment of whether the bankruptcy court's fact-findings are clearly erroneous. United States Abatement Corp. v. Mobil Exploration and Producing U.S., Inc. (In re United States Abatement Corp.), 79 F.3d 393, 397 (5th Cir. 1996). We may conclude that a fact-finding of the bankruptcy court is clearly erroneous only if "we are left with the definite and firm conviction that a mistake has been made." Chamberlain v. Commissioner, 66 F.3d 729, 732 (5th Cir. 1995).

## III. DISCUSSION

SWEPCO and the CCM (collectively, the Appellants) contend that the district court erred by usurping the bankruptcy court's fact-finding role and subsequently determining that the payments from SWEPCO to the CCM violated the Bankruptcy Code and rendered the SWEPCO Plan unconfirmable as a matter of law. We address in

17

turn each of the sections of the Bankruptcy Code upon which the district court predicated its determination that SWEPCO's payments to the CCM rendered the SWEPCO Plan unconfirmable as a matter of law and that disgorgement of the payments was required.

## A.   Section 1129(a)(4)

The district court concluded that SWEPCO's payment to the CCM violated 11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) provides that a court shall not confirm a Chapter 11 plan of reorganization unless

> [a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4).  Both the bankruptcy court and the district court rejected the Appellants' contention that § 1129(a)(4) is entirely inapplicable to SWEPCO's payments to the CCM.  We agree.

In determining a statute's meaning, "the beginning point must be the language of the statute."  Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 474 (1992); see also Chair King, Inc. v. Houston Cellular Corp., 131 F.3d 507, 511 (5th Cir. 1997).  Section 1129(a)(4) by its terms requires court approval of "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the

18

case." 11 U.S.C. § 1129(a)(4) (emphasis added). The bankruptcy court's findings of fact indicate that this language covers the payments at issue here.

The bankruptcy court found that the payments were the culmination of negotiations that began in November 1996. The November 12, 1996 letter from SWEPCO's counsel to the CCM's counsel, attached to the November 13, 1996 memorandum from Kleiman to the CCM members, indicates that the payments contemplated by these negotiations were to be for "fees and expenses incurred by the Members Committee in connection with the confirmation and adversary proceeding." Further, SWEPCO's January 9, 1997 letter, which described the terms surrounding the payments, states that the payments were "intended to address the[] concerns [of increased financial pressure on the CCM caused by the disqualification of its counsel] and allow the parties to continue to pursue the serious bankruptcy issues." SWEPCO and the CCM can hardly argue that the payments were not "for services or for costs and expenses in or in connection with the [bankruptcy] case." 11 U.S.C. § 1129(a)(4); see also Leiman v. Guttman, 336 U.S. 1, 5, 8 (1949) (noting that "all payments," "in connection with," and "incident to," as used in section 221(4) of the Bankruptcy Act, the statutory precursor to § 1129(a)(4), constituted "pervasive terms" that rendered the statute applicable to a broad array of payments not limited to those payable out of the bankruptcy estate); In re Talley, 97 B.R. 312,

19

315 (Bankr. W.D. La. 1989) (indicating that <u>Leiman</u> warrants a broad reading of § 1129(a)(4)).  While a strong argument might be made that payments that are not made to fiduciaries and that do not deplete the bankruptcy estate need not be subject to court approval, this is simply not the decision that Congress has chosen to make.  See <u>In re Hendrick</u>, 45 B.R. 976, 985 (M.D. La. 1985) (noting the compelling nature of a plan proponent's contention that judicial scrutiny of its payment of legal fees that did not deplete the bankruptcy estate was unnecessary but concluding that the plain language of § 1129(a)(4) rendered the payments subject to review by the bankruptcy court); Kenneth M. Klee, <u>Adjusting Chapter 11:  Fine Tuning the Plan Process</u>, 69 AM. BANKR. L.J. 551, 567 (1995) (noting that "[s]ection 1129(a)(4) . . . has been interpreted literally to require court approval of payment of professional fees from assets of third parties, even in the context of a creditor's plan" and contending that "[t]his paragraph of § 1129(a) should be amended to apply only to payments made from estate funds.").  The plain language of § 1129(a)(4) compels us to conclude that SWEPCO's payments to the CCM were subject to bankruptcy court approval.

The plain language of § 1129(a)(4), however, likewise leads us to reject the district court's construction of § 1129(a)(4) as requiring in all circumstances that the bankruptcy court review a payment subject to § 1129(a)(4) for reasonableness prior to the making of the payment.  The language of the statute merely states

20

that, as a condition precedent to plan confirmation, any payment "made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" must "ha[ve] been approved by, or [be] subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Nothing in this language purports to require that the bankruptcy court review a pre-confirmation payment prior to its being made.

Furthermore, the legislative history of the statute provides no indication that Congress intended to impose such a requirement. See Ashland Chem. Inc. v. Barco Inc., 123 F.3d 261, 266 (5th Cir. 1997) ("Where a statute is silent or ambiguous as to an issue, we next look to the legislative history for guidance as to the intent of the legislators."). The House Report addressing § 1129(a)(4) provides as follows:

> Paragraph (4) is derived from section 221 of present law. It requires that any payment made or promised by the proponent . . . for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, be disclosed to the court. In addition, any payment made before confirmation must have been reasonable, and any payment to be fixed after confirmation must be subject to the approval of the court as reasonable.

H.R. REP. 95-595, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6368. It does not logically follow from the fact that a pre-confirmation payment "must have been reasonable" that the determination that the payment was reasonable must have preceded the payment.

21

Additionally, it is noteworthy that other sections of the Bankruptcy Code demonstrate that, when Congress wishes to impose a requirement of pre-payment judicial approval, it knows how to say so. Section 330, for example, provides for the award of "reasonable compensation" to "a trustee, an examiner, [or] a professional person employed under section 327 or 1103" only "[a]fter notice to the parties in interest and the United States Trustee and a hearing." 11 U.S.C. § 330(a). Similarly, § 331 provides that "[a] trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103" may apply for interim compensation or reimbursement, and that the court may award such compensation or reimbursement "[a]fter notice and a hearing." Id. § 331. We conclude that Congress's express provision for pre-payment judicial review of payments in other sections of the Code renders its silence with respect to the timing of the judicial determination of the reasonableness of a payment subject to § 1129(a)(4) meaningful.

We decline to impose a requirement that the bankruptcy court determine the reasonableness of pre-confirmation payments by a plan proponent prior to the making of the payments in the absence of any manifestation of congressional intent to create such a requirement. At most, the statute, informed by other provisions of the Code and its legislative history, can be read to require that pre-confirmation payments "ha[ve] been approved by . . . the court as reasonable" prior to confirmation. 11 U.S.C.

22

§ 1129(a)(4).  In this regard, the bankruptcy court correctly concluded that the SWEPCO Plan cannot be approved unless and until it reviews SWEPCO's payments to the CCM and concludes that they were reasonable.  Assuming that this review takes place and the bankruptcy court concludes that the payments were reasonable (and such determination is not clearly erroneous), § 1129(a)(4) poses no barrier to the confirmation of the SWEPCO Plan.[4]  We therefore conclude that the district court erred in holding that § 1129(a)(4) bars confirmation of the SWEPCO Plan solely because SWEPCO did not obtain a determination from the bankruptcy court that its payments to the CCM were reasonable prior to making them.

The district court went on to conclude that the payments could not comply with § 1129(a)(4) because they were made for an improper purpose, i.e., to buy the votes of the CCM members for the SWEPCO Plan, and thereby concluded that the bankruptcy court's conclusion to the contrary was clearly erroneous.  However, the Trustee and the Appellants both agree that the CCM members' votes were, as a practical matter, "not worth buying"[5]

_____

[4]  In the event that the bankruptcy court determines that the payments were, in whole or in part, unreasonable, it will doubtless order the disgorgement of the unreasonable portion of the payments.  Assuming that the CCM were to comply with such an order--we were advised at oral argument that the CCM has expressly agreed to do so--§ 1129(a)(4) would in all probability pose no barrier to confirmation of the SWEPCO Plan.

[5]  In his brief, the Trustee states, "Appellants cheapen the Members' critical role in this case by deeming their votes 'not

23

because, to say the least, they did not control the class of unsecured creditors containing their claims and, in their capacity as equity interest holders in Cajun,[6] were deemed to have voted against all three proposed plans because they received no property under any of them. Under the circumstances, the district court's conclusion that the bankruptcy court clearly erred in deciding that the payments at issue here did not constitute vote-buying was itself erroneous.

The Trustee argues, however, that the payments were nonetheless unreasonable because they were made to buy the CCM members' support for the SWEPCO Plan in the specific form of an exclusive agreement to enter into power-supply agreements with SWEPCO (as set out in the SWEPCO/CCM term sheets filed with the bankruptcy court), thereby impeding the efforts of the proponents of the other two plans to negotiate voluntary power-supply

---

worth buying.' . . . Literally, this is true."

[6] We note that there may be some question as to whether the members' interests in Cajun constitute "equity interests" in the strict sense of the term. Cf. In re Wabash Valley Power Ass'n, 72 F.3d 1305, 1313 (7th Cir. 1995) (noting that members of a cooperative organized under Indiana law "are not owners in any usual sense of the term" and that, "[b]y design, in a co-operative association the concept of profit is inappropriate, because profit, in its recognized economic sense, is the wage of the entrepreneur, and in a co-operative there is no entrepreneur"). However, as indicated infra, our decision hinges in no way upon the characterization of the members' various interests in Cajun as debt or equity-based. For purposes of this appeal, we therefore accept the parties' characterization of Cajun's members as possessing both debt claims and equity interests.

agreements with the CCM members.  The term sheets reflect that the CCM members have agreed, expressly subject to the Bankruptcy Code, to enter into power-supply agreements with SWEPCO and no other party "unless or until an order is issued i) denying confirmation of the [SWEPCO] Plan; ii) confirming a plan proposed by another plan proponent; or iii) expressly authorizing support of another plan that has been materially amended from its current version."  As counsel for the Trustee indicated in argument before the district court, it is this agreement that the Trustee challenges as unreasonable and unlawful under the Bankruptcy Code.

Even if we assume, strictly for purposes of argument, that the SWEPCO/CCM term sheets contain provisions that render the SWEPCO Plan unconfirmable, it does not follow inexorably that SWEPCO's payments to the CCM served as consideration for such provisions.  Because the only issue litigated before the bankruptcy court and the district court was the propriety of SWEPCO's payments to the CCM (and not the propriety of the SWEPCO/CCM term sheets in a more general sense), the potential viability of the Trustee's argument on appeal hinges upon a factual determination that SWEPCO conditioned the CCM members' retention of the payments upon their consent to the agreements reflected in the SWEPCO/CCM term sheets.  It is in this regard that the Trustee's argument fails because the bankruptcy court made a fact-finding that the payments were not so conditioned.

25

Specifically, the bankruptcy court concluded that the payments were "generally made without strings attached," and that "[t]he only requirement was that the funds would be repaid to SWEPCO in the event that . . . another plan was confirmed and the Members received reimbursement under the confirmed plan." We cannot say that this fact-finding is clearly erroneous.

During the six-day hearing that the bankruptcy court conducted on the Trustee's motion, it heard the testimony of numerous witnesses, including SWEPCO's president and representatives of the CCM members who were involved in the negotiations surrounding SWEPCO's payments to the CCM. The parties involved in these negotiations testified uniformly that the only circumstance in which SWEPCO would require the CCM members to repay the funds was if another plan was confirmed and another plan proponent reimbursed the CCM members' legal expenses. The bankruptcy court was free to, and did, credit this testimony.

The Trustee capitalizes upon the fact that the January 9, 1997 letter from SWEPCO's counsel states that, "[i]n the event any Member supports another plan or receives reimbursement from any other proponent, then the Member cooperative agrees to promptly reimburse SWEPCO for the respective expenses paid by SWEPCO and received by such Member." (emphasis added). Admittedly, this sentence, considered in a vacuum, indicates that the CCM members must return the funds in the event that they

26

simply support another plan.  However, the letter does not specify what the phrase "supports another plan" means, and it is unclear whether simply entering into a power-supply agreement with another plan proponent would of itself constitute "support" for another plan as that term is used in the letter.  Moreover, the very next sentence of the letter states that "[t]he cooperative also agrees to use its best efforts to obtain reimbursement from any other proponent, in the event the said cooperative elects to endorse another plan."  If the CCM members had an absolute obligation to return SWEPCO's payments in the event that they simply chose to support another plan, SWEPCO would likely have little, if any, interest in ensuring that the CCM members obtained reimbursement for their legal expenses from another plan proponent.  So long as SWEPCO is repaid, it is doubtful that SWEPCO would care one way or the other whether the CCM members obtain reimbursement as well.

Moreover, the January 9, 1997 letter, as modified by Kleiman's January 16, 1997 letter, provided that, "[i]n the event of an adverse court ruling such that the SWEPCO/[]Members Committee Plan is not approved by the court, but rather a different plan is approved by the court, and the plan proponent does not reimburse the Members' attorneys fees and expert fees, the Members will have no obligation to reimburse SWEPCO," and, "in the event that no plan is confirmed, then in such event the Members shall have no obligation to reimburse SWEPCO."

27

Additionally, the memorandum that Kleiman sent the CCM members on the same date as the January 9, 1997 letter states that the "only condition [on the CCM members' retention of the $1 million paid by SWEPCO] is that the Members will use their best efforts to have that amount repaid in the event that they support a different plan proponent at some date in the future."

In light of this testimonial and documentary evidence, we are not left with the firm and definite conviction that the bankruptcy court made a mistake in determining that SWEPCO did not condition the CCM members' retention of its payments upon their agreeing to the terms set forth in Paragraph VI.A of the SWEPCO/CCM term sheets. The bankruptcy court's fact-finding in this regard is therefore not clearly erroneous. See Chamberlain, 66 F.3d at 732. As stated earlier, we therefore have no occasion to determine whether the provisions of this paragraph in the term sheets in any way render the SWEPCO Plan unconfirmable. It is for the bankruptcy court to determine in the first instance during the confirmation process whether any portion of the SWEPCO/CCM term sheets renders the SWEPCO Plan unconfirmable.[7]

---

[7] We note that the bankruptcy court concluded that the SWEPCO/CCM term sheets did not create an impermissible lock-in between SWEPCO and the CCM members. We have declined to address the correctness of this conclusion solely because it is unnecessary to our disposition of this appeal, which involves only the propriety of SWEPCO's payments to the CCM. Our failure to address the bankruptcy court's conclusion that no impermissible lock-in exists should in no way be construed as implying that this conclusion is problematic.

We likewise do not decide whether the payments at issue are otherwise reasonable. The ultimate determination of the reasonableness of the payments is a matter to be decided in the first instance by the bankruptcy court, and it will take up this matter on disposition of the pending application for nunc pro tunc approval of payments filed by SWEPCO and the CCM members.

We note that § 1129(a)(4)'s requirement that the bankruptcy court determine whether payments subject to the subsection are "reasonable" creates a "relatively open-ended standard [that] is potentially ambiguous." See 7 COLLIER ON BANKRUPTCY ¶ 1129.03[4], at 1129-39 (Lawrence P. King ed., 15th ed. rev. 1998). What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate. In the typical case, payments that are not payable from, or reimbursable by, the bankruptcy estate should not engender anything like the judicial scrutiny devoted to those that are payable out of the bankruptcy estate. Where the bankruptcy court has determined that the payment at issue was for an expense that is routine in the confection and confirmation of a plan (e.g., for legal or accounting services, expert witness fees, printing, etc.) and that the payment has not been made from and will not be reimbursed by the bankruptcy estate, the court will ordinarily have little reason to inquire further with respect to the amount

29

charged.  Bankruptcy courts in general, and this one in

particular, are sufficiently overburdened that they and we should

be chary about succumbing to the exhortations of litigants to

turn § 1129(a)(4) into a mandate for an expensive and unnecessary

inquiry.

### B.  Section 1125

The district court also concluded that SWEPCO's payments to

the CCM violated 11 U.S.C. § 1125 because the payments were not

adequately disclosed.  Section 1125(b) provides as follows:

> An acceptance or rejection of a plan may not be
> solicited after the commencement of the case under this
> title from a holder of a claim or interest with respect
> to such claim or interest, unless, at the time of or
> before such solicitation, there is transmitted to such
> holder the plan or a summary of the plan, and a written
> disclosure statement approved, after notice and a
> hearing, by the court as containing adequate
> information.  The court may approve a disclosure
> statement without a valuation of the debtor or an
> appraisal of the debtor's assets.

11 U.S.C. § 1125(b).  Section 1125(a)(1) defines "adequate

information" as that term is used in subsection (b) to include

"information of a kind, and in sufficient detail, as far as is

reasonably practicable . . . that would enable a hypothetical

reasonable investor typical of holders of claims or interests of

the relevant class to make an informed judgment about the plan."

Id. § 1125(a)(1).

The legislative history of § 1125 indicates that, in

determining what constitutes "adequate information" with respect

30

to a particular disclosure statement, "[b]oth the kind and form of information are left essentially to the judicial discretion of the court" and that "[t]he information required will necessarily be governed by the circumstances of the case." S. REP. NO. 95-989, at 121 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5907; see also Texas Extrusion Corp. v. Lockheed Corp. (In re Texas Extrusion Corp.), 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."), vacated on other grounds, Adams v. First Fin. Dev. Corp. (In re First Fin. Dev. Corp.), 960 F.2d 23 (5th Cir. 1992).

Assuming without deciding that a reasonable investor would consider information regarding SWEPCO's payments to the CCM, which were not made out of the bankruptcy estate's assets, material to an informed judgment about the SWEPCO Plan, we conclude that the bankruptcy court did not abuse its discretion in determining that SWEPCO's supplemental disclosure statement adequately disclosed the possibility of the payments by SWEPCO to the CCM. The supplemental disclosure statement provided that "SWEPCO may agree to pay certain expenses of the Members Committee in regard to certain litigation and the plan confirmation process." This statement is not limited to post-confirmation payments and thus covers the payments at issue here. While it is true that the statement is quite general, "we find

31

that the bankruptcy court did not abuse its discretion in holding that the [supplemental disclosure statement] nevertheless was adequate to enable a reasonable creditor to make an informed judgment about the [SWEPCO] Plan." Id. The district court therefore erred in reversing the bankruptcy court's determination that SWEPCO's supplemental disclosure statement contained adequate information with respect to the payments by SWEPCO to the CCM.

## C. Section 1123(a)(4)

The district court also concluded that SWEPCO's payments to the CCM constituted a violation of 11 U.S.C. § 1123(a)(4), which provides that, "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). However, SWEPCO's payments to the CCM did not constitute discrimination amongst claims of the same class as contemplated by this section because the payments were not derived, directly or on this record indirectly, from assets of the bankruptcy estate, a fact that the district court acknowledged when it ordered the payments returned to SWEPCO rather than added to the bankruptcy estate. Moreover, as the bankruptcy court found, the payments were not made in

32

satisfaction of the CCM members' claims against Cajun, but rather as reimbursement for plan and litigation expenses incurred in the bankruptcy case.  Accordingly, the payments did not violate § 1123(a)(4).

## D.  Section 1129(b)

The district court also concluded that SWEPCO's payments to the CCM violated 11 U.S.C. § 1129(b).  Section 1129(b) allows confirmation of a plan upon request of the proponent despite the rejection of the plan by one or more classes "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1); 3 DAVID G. EPSTEIN ET AL., BANKRUPTCY § 10-19, at 35 (1992).  The subsection provides that, "[w]ith respect to a class of unsecured claims," a plan is "fair and equitable" only if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii).  This is known as the absolute priority rule.  See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1276 (5th Cir. 1991).

The district court's conclusion that SWEPCO's payments to the CCM violated the absolute priority rule is problematic for

33

the same reasons that led us to reject the district court's conclusion that the payments violated § 1123(a)(4). In particular, the payments were not made "on account of [the CCM members'] [unsecured] claim[s] or [their equity] interest[s]." 11 U.S.C. § 1129(b)(2)(B)(ii). Accordingly, the district court erred in concluding that § 1129(b) precluded confirmation of the SWEPCO Plan by reason of SWEPCO's payments to the CCM.

### E. Section 1129(a)(3)

The district court also concluded that, in light of SWEPCO's payments to the CCM, 11 U.S.C. § 1129(a)(3) precluded confirmation of the SWEPCO plan as a matter of law because the payments were themselves improper and SWEPCO further improperly concealed them. Section 1129(a)(3) provides that a plan may not be confirmed unless "[t]he plan has been proposed in good faith and not by any means forbidden by law."

In construing § 1129(a)(3), we have noted that "[t]he requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." Financial Sec. Assurance Inc. v. T-H New Orleans Ltd. Partnership (In re T-H New Orleans Ltd. Partnership), 116 F.3d 790, 802 (5th Cir. 1997); see also Jasik v. Conrad (In re Jasik), 727 F.2d 1379, 1383 (5th Cir. 1984) ("The 'good faith' of a reorganization

plan must be 'viewed in light of the totality of the circumstances surrounding confection' of the plan." (quoting <u>Public Fin. Corp. v. Freeman</u>, 712 F.2d 219, 221 (5th Cir. 1983))).  We have also observed that "[t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals."  <u>Id.</u>

The bankruptcy court made a factual determination that the payments were not made in bad faith and that SWEPCO and the CCM at all times intended to make appropriate disclosures.  We cannot say that this fact-finding was clearly erroneous.  Additionally, neither the district court nor the Trustee has demonstrated any independent illegality that would implicate § 1129(a)(3)'s requirement that a plan proponent not propose a plan "by any means forbidden by law."  <u>See</u> 11 U.S.C. § 1129(a)(3).  As such, the district court erred in concluding that § 1129(a)(3) rendered the SWEPCO Plan unconfirmable as a matter of law by reason of SWEPCO's payments to the CCM.

## IV.  CONCLUSION

The district court erred in "disqualifying" the SWEPCO Plan on the ground that it is unconfirmable as a matter of law by reason of SWEPCO's payments to the CCM.  Because the bankruptcy court has not yet determined the reasonableness of these payments, the district court likewise erred in ordering their disgorgement.  We therefore REVERSE the district court's orders

35

disqualifying the SWEPCO Plan and requiring disgorgement of the payments from SWEPCO to the CCM.  The stay entered by this court on July 10, 1998 is vacated.  The costs of this appeal shall be borne by the appellees.  The mandate shall issue forthwith.