REVISED OCTOBER 1, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-31258
_____

In the Matter of CAJUN ELECTRIC POWER COOPERATIVE,
INCORPORATED,

                              Debtor.

_____

LOUISIANA PUBLIC SERVICE COMMISSION, and Unofficial
Members Committee,

                              Appellant,

v.

RALPH R. MABEY, Chapter 11 Trustee for Cajun Electric
Power Cooperative, Inc; RURAL UTILITIES SERVICES;
UNSECURED CREDITORS COMMITTEE,

                              Appellee.

_____

Appeal from the United States District Court
for the Middle District of Louisiana
_____

August 16, 1999

Before KING, Chief Judge, and REAVLEY and BENAVIDES, Circuit
Judges.

KING, Chief Judge:

     The Louisiana Public Service Commission appeals an order of

the bankruptcy court enjoining it from reducing, or considering

any argument in support of reducing, the wholesale rates charged

by the debtor, Cajun Electric Power Cooperative, Inc., as a

result of the suspension of debt service occasioned by its filing

under Chapter 11 of the Bankruptcy Code.  Because we determine

that the bankruptcy court abused its discretion by issuing such an injunction, we reverse the district court's order affirming the bankruptcy court's injunction and grant of summary judgment in favor of appellees and we remand for further proceedings.

## I. FACTUAL & PROCEDURAL BACKGROUND

This case involves the latest chapter in a long-running proceeding arising from Cajun Electric Power Cooperative, Inc.'s (Cajun) filing of a petition seeking reorganization under Chapter 11 of the Bankruptcy Code on December 21, 1994.[1]  Cajun has twelve members, all of whom are electric distribution cooperatives serving retail customers in Louisiana.  Cajun generates and sells electricity to each member and to non-members, and each member has contracted to purchase at wholesale rates all of the member's electric power requirements from Cajun. Cajun's bankruptcy proceeding is a "mega-case," involving more than five billion dollars in debt and over seven hundred creditors.  Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.), 150 F.3d 503, 506 (5th Cir. 1998),

---

[1] We have previously considered issues arising from Cajun's bankruptcy proceeding on several occasions, and we therefore summarize only those facts necessary for the disposition of this appeal.  See Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.), 150 F.3d 503 (5th Cir. 1998), cert. denied, 119 S. Ct. 2019 (1999); Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.), 119 F.3d 349 (5th Cir. 1997); United States v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.), 109 F.3d 248 (5th Cir. 1997); Cajun Elec. Power Coop., Inc. v. Central La. Elec. Coop., Inc. (In re Cajun Elec. Power Coop., Inc.), 74 F.3d 599 (5th Cir 1996).

cert. denied, 119 S. Ct. 2019 (1999).  Most of Cajun's debt is owed to the Rural Utilities Service of the United States Department of Agriculture (the RUS), which has filed a claim in excess of four billion dollars.

On January 23, 1996, the Louisiana Public Service Commission (the LPSC or Commission), acting pursuant to authority granted by Louisiana law, reopened a rate investigation of Cajun.  See LA. CONST. art. IV, § 21 (stating that the LPSC "shall regulate . . . public utilities and have such other regulatory authority as provided by law"); LA. REV. STAT. ANN. § 45:1163 (stating that the LPSC "shall exercise all necessary power and authority over any . . . public utility for the purpose of fixing and regulating the rates charged or to be charged by and service furnished by such public utilities").  The LPSC sets the wholesale rates that Cajun may charge customers (Cajun's members and others) based on its current costs, including (as relevant here) the interest expense that Cajun must pay to service its debt.  The LPSC staff urged the Commission to reduce Cajun's rates by 8.15 mills per kilowatt hour (from 45.2 mills to approximately 37 mills per kilowatt hour), or $48,437,462 per year, "because Cajun is not paying or accruing interest on its underlying debt during the pendency of its bankruptcy proceeding."  Ex Parte Louisiana Pub. Serv. Comm'n, No. U-17735-F, 1996 La. PUC LEXIS 70, at *2, *9-*10 (La.P.S.C. Oct. 16, 1996).

3

An administrative law judge held a hearing regarding the proposed rate decrease on September 17 and 18, 1996. The LPSC staff asserted that neither Cajun nor the RUS has accrued interest in its accounting records with respect to Cajun's debt, and that generally applicable accounting principles do not permit such an accrual. The LPSC staff introduced Cajun's financial statements which state in a footnote that "Cajun will recognize interest expense in the financial statements while in Chapter 11 only to the extent it is ordered to pay interest by the Bankruptcy Court," and a consultant hired by Cajun to develop its revenue requirements testified that "since the appointment of the trustee, Cajun has not paid or accrued any interest expense on the underlying debt." The LPSC staff therefore urged the administrative law judge that "the amount of the interest expense should be collected in escrow, subject to refund to the members upon a determination by the bankruptcy court and/or the Commission that Cajun has no interest obligation." Id. at *9-*10.

The Unofficial Members Committee (the Members Committee), then consisting of ten of the twelve members but now including only seven members, agreed with the LPSC staff and took the position that Cajun's interest expense should be excluded from its revenue requirement. See id. at *10. The Members Committee argued to the administrative law judge that "because Cajun is not paying interest expense and not accruing interest expense during

4

the pendency of its bankruptcy, it is not appropriate for the Commission to include interest expense in Cajun's revenue requirement for rate making purposes at this time." Id. Following the hearing, the administrative law judge recommended to the Commission that the interest expense component of Cajun's rates be collected subject to refund, pending a determination by the bankruptcy court concerning Cajun's interest expense liability during bankruptcy. See id. at *3.

Ralph Mabey, as the Chapter 11 trustee for Cajun, filed this suit seeking injunctive and declaratory relief in the United States Bankruptcy Court for the Middle District of Louisiana on September 11, 1996. Specifically, Mabey sought an injunction pursuant to 11 U.S.C. § 105(a)[2] that would prohibit the Members Committee "from presenting, and the LPSC from considering, any arguments that Cajun's rate should be lowered based solely on the suspension of debt service occasioned by the filing of its petition for reorganization in the Rate Docket pending before the LPSC," and a judgment declaring that "Cajun's rates may not be reduced based solely on the suspension of its debt service obligations occasioned by the filing of its petition for reorganization." Mabey simultaneously filed a motion seeking a preliminary injunction enjoining the same conduct.

---

[2] Section 105(a) states that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

The bankruptcy court denied Mabey's motion for a preliminary injunction, stating that it had earlier determined that the LPSC could pursue the rate docket and that "the laws of the state of Louisiana with respect to the conduct of the rate docket during the chapter 11 proceeding are neither expressly nor implicitly preempted by the Bankruptcy Code."  The bankruptcy court noted that although it would be "sensitive to particular problems that may result from the conduct of the rate docket," Mabey had failed to demonstrate that the estate would suffer irreparable injury without a preliminary injunction because the administrative law judge recommended only that the interest portion of the rate be collected "subject to refund."

Following the denial of Mabey's motion for a preliminary injunction, the LPSC ordered that Cajun may continue to collect rates which include the interest expense component, subject to refund of that component, "for up to sixty (60) days--or longer if an Order is obtained from the bankruptcy court requiring the payment of interest or other legitimate bankruptcy-related expenses not reflected in rates."  Ex Parte Louisiana Pub. Serv. Comm'n, 1996 La. PUC LEXIS 70, at *31.  The LPSC subsequently amended its order by eliminating the sixty-day requirement, requiring Cajun to place the interest-expense portion of revenues in escrow, and stating that "all amounts refunded to the distribution cooperatives from the escrow account must be in turn refunded to consumers."  Ex Parte Louisiana Pub. Serv. Comm'n,

6

No. U-17735-H, 1996 La. PUC LEXIS 69, at *4 (La.P.S.C. Nov. 13, 1996).  Mabey has appealed the amended rate order in the Louisiana courts.

The LPSC and the Members Committee filed separate answers to Mabey's complaint on November 15, 1996.  The Members Committee counterclaimed, seeking a declaratory judgment that "Cajun does not, in fact, have an obligation to make or accrue interest expense payments during the pendency of its bankruptcy proceeding," and that therefore Cajun's rates should be reduced immediately under the LPSC's rate order.  The Official Committee of Unsecured Creditors of Cajun and the RUS, each of whom had intervened in this suit, filed a motion for summary judgment in January 1998 requesting that the court terminate the escrow and declare that Cajun's rates may not be reduced based on the suspended interest obligation.  Both Mabey and the LPSC (joined by the Members Committee) also sought summary judgment in their favor.

The bankruptcy court granted Mabey, the Official Committee of Unsecured Creditors of Cajun, and the RUS (collectively, appellees) summary judgment on all claims, including the counterclaim, on April 2, 1998.  The court ordered that the Members Committee and its individual members "are enjoined from presenting, and the LPSC is enjoined from considering, any argument that [Cajun's] wholesale rate to its members should be lowered during this proceeding based solely upon the suspension

of debt service occasioned by the filing of this proceeding," and that Cajun's "wholesale rates to its [m]embers may not be reduced during this proceeding where such reduction is based solely upon the filing of this case." The bankruptcy court denied the LPSC's motion to stay and the escrow terminated in April 1998.

The bankruptcy court based its decision on its determination that postpetition interest "continues to accrue, but generally is not allowable under applicable provisions of the Bankruptcy Code." As support for this proposition, the court cited 11 U.S.C. § 502(b)(2)[3] and ruled that the debtor's ultimate liability for payment of such interest is not resolved "unless and until the debtor receives a discharge under bankruptcy law." The court found that "there is absolutely no question but that the RUS is an undersecured creditor," but that two of the reorganization plans that were then pending before the bankruptcy court "may well prevent [Cajun] from receiving a discharge." Moreover, the bankruptcy court stated that 11 U.S.C. § 502(b)(2) is a "mechanism[] by which debtors are given [a] breathing spell," and that the purpose of this "breathing spell" is "to allow the debtor to reorganize, not to allow other parties to benefit at the expense of others." Finally, the bankruptcy court

---

[3] Section 502(b)(2) provides that a bankruptcy court shall determine the amount of a creditor's claim as of the date of the filing of the bankruptcy petition, and "shall allow such claim in such amount, except to the extent that . . . such claim is for unmatured interest."

8

determined that any reduction in rates would violate "principles espoused by the absolute priority rule [that] should and do permeate the entire chapter 11 case--rights of equity are subordinate to rights of creditors," and that any rate reduction "would result in the [m]embers receiving in excess of $50 million prior to any distribution to creditors."[4]  The United States District Court for the Middle District of Louisiana affirmed the bankruptcy court's order "essentially[] for the reasons found by the bankruptcy judge" on October 1, 1998.  The LPSC timely appeals.

## II.  THE REGULATED PUBLIC UTILITY AND CHAPTER 11

The LPSC argues on appeal that the bankruptcy court exceeded its authority by enjoining it from considering decreasing Cajun's rates based on the suspension of Cajun's obligation to pay interest during the bankruptcy proceeding and by terminating the escrow established by the LPSC's rate order.  The LPSC argues that "no legal basis exists for the injunction" because the bankruptcy court's determination that interest continues to accrue after a petition has been filed under Chapter 11 is

---

[4] Under the absolute priority rule, a plan of reorganization is considered "fair and equitable" under 11 U.S.C. § 1129(b), and is thus subject to confirmation despite the rejection of the plan by one or more classes of claims or interests, if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii); see Mabey v. Southwestern Elec. Power Co., 150 F.3d at 519.

9

"flatly inconsistent with the statutes, their history and the precedents," and that the bankruptcy court exceeded its statutory authority under 11 U.S.C. § 105(a) by issuing the injunction because it sets a particular rate. The LPSC contends that Congress has preserved state rate-making authority during the pendency of a bankruptcy proceeding by excepting such rate-making from the automatic stay provision in 11 U.S.C. § 362[5] and requiring regulatory approval of rates in a reorganization plan in 11 U.S.C. § 1129(a)(6).[6] As further evidence that the bankruptcy court exceeded its authority under 11 U.S.C. § 105(a), the LPSC points to the requirement that a bankruptcy trustee "shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession

---

[5] Section 362(a) provides in relevant part that the filing of a bankruptcy petition "operates as a stay, applicable to all entities, of . . . the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title." Under § 362(b)(4), however, such a filing "does not operate as a stay . . . of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's or organization's police and regulatory power."

[6] Under 11 U.S.C. § 1129(a)(6), a reorganization plan shall be confirmed by the bankruptcy court only if "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."

10

thereof," 28 U.S.C. § 959(b), and the Johnson Act, 28 U.S.C. § 1342.[7]  Finally, the LPSC argues that the Seventh Circuit's treatment of a bankrupt public utility cooperative in In re Wabash Valley Power Ass'n, 72 F.3d 1305 (7th Cir. 1995), demonstrates that the escrow arrangement ordered by the LPSC is appropriate and that interest is not owed for the postpetition period.[8]

---

[7] Under the Johnson Act,

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where . . . [j]urisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution . . . .

28 U.S.C. § 1342.  Relying on our decision in Gulf Water Benefaction Co. v. Public Util. Comm'n, 674 F.2d 462 app. at 467-68 (5th Cir. 1982) (per curiam), the LPSC argues that "the Johnson Act is a limitation on bankruptcy jurisdiction" and that therefore the bankruptcy court's order was improper.  In Gulf Water Benefaction, we affirmed the lower courts' determination that the Johnson Act deprived them of jurisdiction to consider a regulated utility's claim that the rates set by a public utility commission violated the federal constitution as a taking of property without just compensation and without affording the utility due process.  See id. app. at 465.  Because our jurisdiction in this case is based on neither diversity of citizenship nor a constitutional claim, the Johnson Act does not apply to the claims we consider here.  See New Orleans Pub. Serv., Inc. v. City of New Orleans, 782 F.2d 1236, 1242 (5th Cir.), modified, 798 F.2d 858 (5th Cir. 1986) ("A statutorily-based preemption claim will not provide a basis for invoking the Johnson Act to deprive the federal courts of jurisdiction."); see also Public Serv. Co. v. Patch, 167 F.3d 15, 25 (1st Cir. 1998) ("The statute does not apply to claims based upon a congressional statute or federal administrative rulings . . . .").

[8] The debtor in In re Wabash Valley Power Ass'n, a generation and transmission cooperative serving rural electric

11

We need not and do not decide the difficult question whether the bankruptcy court had any authority under § 105(a) to enjoin the LPSC's consideration of a rate decrease based on the suspension of Cajun's debt service or to terminate the escrow established by the LPSC's rate order.[9]  Assuming, without deciding, that the bankruptcy court did have such authority under § 105(a), we conclude that in these circumstances the court's issuance of such an injunction and termination of the escrow

_____

membership cooperatives, contested its obligation (and its right under rate regulations) to continue to make payments in service of its debt during the pendency of its bankruptcy proceeding, and made these payments into an escrow account.  See 72 F.3d at 1308, 1322.  The case did not involve a court's discretion to enjoin a public utility commission's consideration of a rate decrease based on the suspension of debt service or to terminate a commission's establishment of an escrow for such funds, and the decision therefore does not affect our resolution of that issue in this appeal.

[9] Section 105(a) gives bankruptcy courts the equitable power to issue any order "that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, and it is in this section that bankruptcy courts find their general equitable powers.  See Omni Mfg., Inc. v. Smith (In re Smith), 21 F.3d 660, 665 (5th Cir. 1994).  Those powers, however, "have their limits," id., and "can only be exercised within the confines of the Bankruptcy Code."  Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988); see Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that § 105(a) "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law," or "to act as roving commissions to do equity") (internal quotation marks omitted); In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993) ("Under this section, a court may exercise its equitable power only as a means to fulfill some specific Code provision. By the same token, when a specific Code section addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code.") (citations omitted).

amounted to an abuse of discretion.[10]  See Indian Motocycle

Assocs. III Ltd. Partnership v. Massachusetts Hous. Fin. Agency,

66 F.3d 1246, 1249 (1st Cir. 1995) ("A bankruptcy court's

decision granting or denying injunctive relief pursuant to

Bankruptcy Code § 105(a) is reviewed only for abuse of

discretion."); Commonwealth Oil Ref. Co. v. United States Envtl.

Protection Agency (In re Commonwealth Oil Ref. Co.), 805 F.2d

1175, 1188 (5th Cir. 1986) (reviewing bankruptcy court's refusal

to grant stay under § 105(a) for abuse of discretion); see also

Cargill, Inc. v. United States, 173 F.3d 323, 341 (5th Cir. 1999)

(stating that a court abuses its discretion in granting

injunctive relief when it "relies on erroneous conclusions of

law, or . . . misapplies its factual or legal conclusions").

### A. Cajun as a Regulated Utility

We begin our analysis of the bankruptcy court's injunction

preventing the LPSC from considering a rate decrease based on the

suspension of Cajun's interest obligation by noting that the

Bankruptcy Code "indirectly suggests continued governmental

---

[10] We emphasize that our determination that the bankruptcy court abused its discretion is necessarily limited to the circumstances presented in this appeal.  At least one bankruptcy court has, in effect, intervened in a public utility commission's action with respect to rates charged by a debtor.  See, e.g., In re Jal Gas Co., 44 B.R. 91, 93-95 (Bankr. D.N.M. 1984)(enjoining a rate commission's order that reduced the debtor's rate because the commission's order was "merely a self-help remedy on the part of a creditor").  Our disposition of this case does not require us to determine when, if ever, such an intervention would be appropriate or what form it would take.

13

regulatory jurisdiction" during the pendency of the bankruptcy proceeding. Evan D. Flaschen & Michael J. Reilly, Bankruptcy Analysis of a Financially-Troubled Electric Utility, 59 AM. BANKR. L.J. 135, 144 (1985). Congress created a specific exception from the automatic stay of proceedings against the debtor that occurs upon the debtor's bankruptcy filing for actions or proceedings by governmental units to enforce their police and regulatory power. See 11 U.S.C. § 362(b)(4). Section 1129(a)(6) of the Bankruptcy Code further provides that any rate change in a reorganization plan must be approved by governmental regulatory commissions with proper jurisdiction. See 11 U.S.C. § 1129(a)(6); cf. Frank P. Darr, Federal-State Comity in Utility Bankruptcies, 27 AM. BUS. L.J. 63, 89-90 (1989) (stating that a "shift in control" in favor of public utility commissions in the 1978 Bankruptcy Act, specifically in § 1129(a)(6), "suggests that the commission retains significant authority to govern rates throughout the bankruptcy . . . . [A] regulatory commission retains its traditional control over rates prior to the finalization of a plan.") (footnote omitted).[11] Finally, a bankruptcy trustee must

---

[11] Mabey argues on appeal that 11 U.S.C. § 1129(a)(6) "limit[s] state review of an electric utility's rates during the course of a bankruptcy case." We find no support for such a narrow reading of § 1129(a)(6). Furthermore, as Flaschen and Reilly observe, such an argument "ignores the reasons which mandate [public utility commission] regulation in the first instance. The [commission] is entrusted to safeguard the compelling public interest in the availability of electric service at reasonable rates. That public interest is no less compelling during the pendency of a bankruptcy than at other

"manage and operate the property according to the valid laws of the State in which such property is situated," see 28 U.S.C. § 959(b), and we agree with our sister circuits that "the import" of this section is that "'the general bankruptcy policy of fostering the rehabilitation of debtors [will not] serve to preempt otherwise applicable state laws dealing with public safety and welfare.'" Robinson v. Michigan Consol. Gas Co., 918 F.2d 579, 589 (6th Cir. 1990) (quoting Saravia v. 1736 18th St., N.W., Ltd., 844 F.2d 823, 827 (D.C. Cir. 1988)).

The bankruptcy court and the trustee have both recognized throughout Cajun's bankruptcy proceeding that Cajun is a regulated utility and that the LPSC has an obligation under state law to protect the public interest. The bankruptcy court ruled in 1996 that "the laws of the state of Louisiana with respect to the conduct of the rate docket during the chapter 11 proceeding are neither expressly nor implicitly preempted by the Bankruptcy Code," and that "the LPSC is clearly authorized to act during the Chapter Eleven Proceedings insofar as the rate docket is concerned." In fact, the trustee lodged no objection in the bankruptcy court when, as part of the same rate order we now consider, the LPSC reduced Cajun's rates by $21,743,129 immediately, or from approximately 48.9 mills to 45.2 mills per kilowatt hour, based on various adjustments in Cajun's expenses

---

times." Flaschen & Reilly, supra, at 144.

and revenue.  See Ex parte Louisiana Pub. Serv. Comm'n, 1996 La. PUC LEXIS 70, at *35-*38.  Nonetheless, the trustee asserts that "the LPSC is not entitled to lower rates based upon the suspension of Cajun's debt service in bankruptcy" and that such a reduction "would be extraordinary, not traditional, ratemaking, grounded solely in the happenstance of bankruptcy law."

Although the Bankruptcy Code suggests that the rate-making authority of a public utility commission continues during bankruptcy and the bankruptcy court here has held that the LPSC continues to have the power to set Cajun's wholesale rates, the limits on such authority are unclear, as are the mechanics of how to deal with an order of a public utility commission that exceeds any such limits.  We are not called upon in this case to define appropriate boundaries for a public utility commission's rate-making authority over a debtor utility.  Further, we are not presented with a case where there is evidence that a public utility commission's actions are likely to result in administrative insolvency or will prevent a bankrupt utility from successfully reorganizing.[12]  Rather, it appears that the LPSC

_____

[12] The RUS and the Official Committee of Unsecured Creditors of Cajun argue that the amended rate order "jeopardizes the prospects for a successful reorganization."  The only evidence appellees offer on summary judgment that such a problem would occur, however, is an affidavit of Cajun's chief financial officer in which he states that Cajun would become administratively insolvent if Cajun's rates were reduced by the interest expense component and the bankruptcy court were to subsequently order that interest or other similar payments be paid upon the secured debt during the bankruptcy proceeding.

and appellees disagree as to whether a public utility commission may properly consider one of the effects of bankruptcy in setting a debtor utility's rates. Keeping in mind the role of the LPSC as a guardian of the public interest and Cajun as a regulated utility, we proceed to consider this issue.

## B. The Interest Quandary

The bankruptcy court relied heavily on its determination that interest continues to accrue during a bankruptcy proceeding and that "while the debtor's obligation with respect to such accrued interest may well be discharged at some point in time, that only occurs if and when the debtor obtains such a discharge" from the bankruptcy court. The bankruptcy court stated that "[t]he issue of interest on prepetition debt is totally and completely within the exclusive jurisdiction of this court and may not be dealt with by the LPSC," and noted that "the LPSC

Because the amended rate order provides for a refund of the interest expense collected in escrow to consumers only if the bankruptcy court discharges Cajun's obligation to pay postpetition interest, the contingency that Cajun's chief financial officer states may cause Cajun to become administratively insolvent cannot occur under the amended rate order. Furthermore, we note from the affidavit that, during the approximately seventeen months that the escrow was in effect, Cajun continued to meet its operating expenses without accessing the interest expense component.

Mabey argues that the creation of an escrow under the rate order "could create a superpriority administrative claim in favor of the RUS that would make confirmation of a plan of reorganization impossible." The difficulty with this argument is that it has several premises (some relating to the secured position of the RUS) that we are simply in no position, on this record, to evaluate.

17

acknowledged this conclusion . . . [by] removing the 60-day deadline for determination by this court of the Debtor's interest expense liability."

We agree wholeheartedly with the bankruptcy court's determination that a debtor's obligation with respect to postpetition interest terminates only "if and when" the debtor obtains a discharge from the bankruptcy court.  See 11 U.S.C. §§ 727(b), 1141(d).  As the Supreme Court stated over eighty years ago, although as a general rule postpetition interest is not allowed on undersecured debts, "that is not because the [debts] had lost their interest-bearing quality during that period . . . . and if, as a result of good fortune or good management, the estate proved sufficient to discharge the claims in full, interest as well as principal should be paid."  American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261, 266 (1914); see Kellogg v. United States (In re West Tex. Marketing Corp.), 54 F.3d 1194, 1203 (5th Cir. 1995) (Smith, J., dissenting) (stating that a debtor's obligation to pay interest during bankruptcy "is not extinguished, but, for purposes of the bankruptcy proceedings, is ignored until the time the court determines whether the debtor's assets can meet the obligation. Only upon discharge, see § 727, is the state law obligation to pay extinguished.") (footnote omitted).

We fail to understand, however, why the bankruptcy court determined from these conclusions regarding the timing of the

potential discharge of a debtor's obligation to pay postpetition interest that an injunction was necessary to carry out the provisions of the Bankruptcy Code. The court stated that it "believes the LPSC acknowledged" that the determination of a debtor's postpetition interest obligations is "within the sole and exclusive jurisdiction of the Bankruptcy Court," and the amended rate order establishes the escrow "pending a determination by the United States Bankruptcy Court as to whether Cajun has an obligation to pay interest expense." Ex parte Louisiana Pub. Serv. Comm'n, 1996 La. PUC LEXIS 69, at *2. Further, in denying appellees' request for a preliminary injunction, the bankruptcy court stated that "[t]here appears to be no risk that [Cajun] will suffer irreparable harm" because the "net effect of the recommendation of the ALJ . . . is that portion of the rates paid to Cajun attributable to this interest factor will be segregated . . . . If, in the final analysis, these proceeds were improperly collected, a refund to members may well be in order." We see no meaningful difference between this observation and the escrow established by the rate order. The LPSC does not argue that the funds in escrow should be refunded immediately to consumers and did not join the Members Committee's counterclaim in the bankruptcy court seeking an immediate determination as to Cajun's interest obligation during bankruptcy. Because the LPSC's amended rate order merely sets aside and does not purport to make a final disposition of the

19

contested interest expense component, the bankruptcy court's

conclusion that interest continues to "accrue" postpetition and

that Cajun's interest obligation terminates only if the

bankruptcy court grants a discharge does not warrant the

injunction that it entered in this appeal. We therefore must

look to the other considerations on which appellees and the

bankruptcy court rely.

## C. Breathing Spell

Neither appellees nor the bankruptcy court suggests that any

specific provision of the Bankruptcy Code provides that the

regulation of a bankrupt utility's rates rests with the

bankruptcy court.[13]  Cf. Darr, supra, at 64 (noting that "nowhere

_____

[13] Mabey does argue in his appellate brief that the LPSC did
not have jurisdiction to enter any order which "deprives or
potentially deprives the estate of its property" because the
bankruptcy court has "exclusive jurisdiction" over Cajun's assets
and over determinations affecting the value of those assets under
28 U.S.C. § 1334(e).  See 28 U.S.C. § 1334(e) ("The district
court in which a case under title 11 is commenced or is pending
shall have exclusive jurisdiction of all of the property,
wherever located, of the debtor as of the commencement of such
case, and of property of the estate.").  In the bankruptcy court,
however, appellees made no mention of 28 U.S.C. § 1334(e) and
asserted that the bankruptcy court had jurisdiction pursuant to
28 U.S.C. § 1334(b).  See id. § 1334(b) (providing that "the
district courts shall have original but not exclusive
jurisdiction of all civil proceedings arising under title 11, or
arising in or related to cases under title 11").  If Mabey were
challenging the jurisdiction of the bankruptcy court, we would be
obliged to address his challenge regardless of whether he
asserted it below.  Because his argument challenges the
jurisdiction of the LPSC, however, we are not similarly
constrained and we conclude that Mabey waived any argument that
28 U.S.C. § 1334(e) operates to divest the LPSC of jurisdiction
to consider whether Cajun's wholesale rates are appropriate or
(to the extent that Mabey is making such an argument, which is

20

is it explicitly provided whether the courts or the commissions are to regulate a utility once a bankruptcy proceeding commences"). Instead, appellees rely on "fundamental tenets of bankruptcy law" that "dictate the bankruptcy court's ruling." Specifically, appellees argue that the bankruptcy court properly relied on 11 U.S.C. § 502(b)(2), 11 U.S.C. § 362[14] and the absolute priority rule in granting them summary judgment and enjoining the LPSC from considering a rate decrease. Appellees assert that Cajun is entitled to a "breathing spell" under § 502(b)(2) and § 362(a), and that the purpose of such a "breathing spell" is to "free up" revenues that would otherwise be used for prepetition debt and interest, thus enhancing the debtor's ability to reorganize by paying postpetition administrative expenses and "by making necessary payments in cash to priority creditors and sufficient payments to creditors to induce such creditors to accept a reorganization plan."[15]

---

unclear) to establish the escrow.

[14] Appellees do not argue that the LPSC's consideration of Cajun's rates is stayed automatically under § 362, but rather that § 362, together with § 502(b)(2), is "intended to afford the debtor an important breathing spell during reorganization" and that the LPSC's rate order denied Cajun that "breathing spell."

[15] We are puzzled by appellees' argument that the bankruptcy court properly enjoined the LPSC and terminated the escrow to protect Cajun's "breathing spell," and thus "free up" revenues that would otherwise be used to pay postpetition interest. To the extent that Cajun is compelled to use these funds to pay administrative and operating expenses during the pendency of its bankruptcy proceeding, these funds can hardly be said to be "free," and the rate order indicates that escrow funds may be

21

Appellee Mabey's brief at page 37. Appellees argue that the LPSC rate order violates the absolute priority rule because it diverts revenue that would otherwise be subject to the RUS's secured claim into an escrow account and, if Cajun eventually obtains a discharge, it would return that revenue to the members of Cajun. Finally, appellees contend that any rate decrease based on the suspension of Cajun's interest obligation would be a windfall to its customers "merely by reason of the happenstance of bankruptcy."[16]

We cannot agree with appellees that these "fundamental tenets" of bankruptcy law provide a proper basis for the bankruptcy court to exercise any discretion that it may have under § 105(a) by enjoining the LPSC's consideration of the proper impact of the suspension of Cajun's interest obligation on its wholesale rates and terminating the escrow provision in the LPSC's rate order. Initially, we note that we have previously explained that the central purpose of 11 U.S.C. § 502(b)(2)'s suspension of an undersecured debtor's interest obligations is to

used for "legitimate bankruptcy-related expenses, not recognized for rate making." Ex parte Louisiana Pub. Serv. Comm'n, 1996 La. PUC LEXIS 69, at *2.

[16] Even if preventing a windfall for Louisiana consumers "merely by reason of the happenstance of bankruptcy" were to provide a sufficient basis for the bankruptcy court's injunction under § 105(a), we see no potential for such a windfall when any refund would be subsequent to the bankruptcy court's determination that Cajun has no postpetition interest obligation and would therefore not use such funds for the purpose for which they were collected.

provide equitable treatment to creditors--"allowing the accrual of postpetition interest in favor of one creditor would be 'inequitable' to other creditors." United Sav. Ass'n v. Timbers of Inwood Forest Assocs. (In re Timbers of Inwood Forest Assocs.), 793 F.2d 1380, 1385 (5th Cir. 1986), aff'd on reh'g, 808 F.2d 363 (1987) (en banc), aff'd, 484 U.S. 365 (1988); see also Nicholas v. United States, 384 U.S. 678, 683-84 (1966) (stating that the rule "rests at bottom on an awareness of the inequity that would result if, through the continuing accumulation of interest in the course of subsequent bankruptcy proceedings, obligations bearing relatively high rates of interest were permitted to absorb the assets of a bankrupt estate whose funds were already inadequate to pay the principal of the debts owed by the estate"). Although the effect of suspending debt service may be to make it possible for the debtor to use income to pay its current operating expenses and the administrative expenses of the proceeding, we find no support for appellees' claim that § 502(b)(2) is intended to provide the debtor, a regulated public utility, an unfettered right, vis-a-vis Louisiana consumers, to build up money to give to its undersecured and unsecured creditors.[17]

---

[17] Mabey cites the Seventh Circuit's opinion in In re Fesco Plastics Corp., 996 F.2d at 155, and In re Morrissey, 37 B.R. 571, 573 (Bankr. E.D. Va. 1984), as supporting his contention. These cases simply do not provide any support whatsoever for the proposition that a regulated debtor's prices must be preserved intact throughout a Chapter 11 proceeding so as to build up a pot

Appellees' assertion that Cajun is entitled to a "breathing spell" to help it reorganize is more properly based on the automatic stay provision of 11 U.S.C. § 362.  See Commonwealth Oil Ref. Co., 805 F.2d at 1182 ("The purpose of the automatic stay is to give the debtor a 'breathing spell' from his creditors, and also, to protect creditors by preventing a race for the debtor's assets."); Browning v. Navarro, 743 F.2d 1069, 1083 (5th Cir. 1984) ("The automatic stay is intended to give 'the debtor a breathing spell from his creditors.'") (quoting S. REP. NO. 95-989, at 54-55 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5840-41; H.R. REP. NO. 95-595, at 340 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6297).  Under § 362(a), the filing of a bankruptcy petition operates as a stay of the commencement or continuation of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the bankruptcy proceeding. Congress has explicitly provided an exception to the automatic stay, however, for "the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power."  11 U.S.C. § 362(b)(4).[18]  Because appellees do not argue that the

for undersecured and unsecured creditors.  We have found no cases suggesting such a rule under § 502(b)(2) or elsewhere.

[18] We have previously recognized that significant authority exists suggesting that courts may properly invoke § 105(a) to enjoin proceedings that are excepted from the automatic stay

24

rate-making proceeding at issue in this appeal falls within the automatic stay provided by § 362(a) or outside the exception to the stay provided by § 362(b)(4), the injunction cannot properly rest on the "breathing spell" afforded by § 362(a).

### D. Absolute Priority Rule

Finally, we conclude that the bankruptcy court's assertion that the principles of the absolute priority rule "permeate the entire chapter 11 case" and that any rate reduction would "elevate" the members' equitable interests[19] over the interests

---

under § 362(b)(4). See Commonwealth Oil Ref. Co., 805 F.2d at 1188 n.16 (noting that, although "[c]ourts considering the scope of § 105 have seen it as an avenue available for staying actions that are found to fall within an exception to the automatic stay," a court's powers under § 105 "are not unlimited."); Browning, 743 F.2d at 1084 ("A bankruptcy court has the power to enjoin proceedings excepted from a § 362 stay under 11 U.S.C. § 105[] . . . ."); cf. Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 366 (6th Cir. 1997) ("By creating exceptions for police and regulatory actions, Congress removed local regulation only from the effect of the automatic stay; it did not eliminate the bankruptcy court's power to enjoin the enforcement of local regulation which is shown to be used in bad faith.") (internal quotation marks omitted); Corporacion de Servicios Medicos Hospitalarios de Fajardo v. Mora (In re Corporacion de Servicios Medicos Hospitalarios de Fajardo), 805 F.2d 440, 449 n.14 (1st Cir. 1986) ("We reaffirm, however, that a bankruptcy court does possess the power, in exceptional circumstances, to enjoin even administrative proceedings that are exempt from the automatic stay pursuant to section 362(b)(4), (5)."). Because we conclude that the bankruptcy court abused its discretion by entering the injunction even if it had proper authority under § 105(a), however, we do not consider the scope of a court's power to enjoin administrative proceedings that are excepted from the automatic stay.

[19] We have previously noted that "there may be some question as to whether the members' interests in Cajun constitute 'equity interests' in the strict sense of the term." Mabey v. Southwestern Elec. Power Co., 150 F.3d at 515 n.6 (citing Wabash

of creditors is similarly insufficient to justify the injunction that the court entered. By the explicit terms of the amended rate order, "all amounts refunded to the distribution cooperatives from the escrow account must be in turn refunded to consumers." Ex Parte Louisiana Pub. Serv. Comm'n, 1996 La. PUC LEXIS 69, at *4. The bankruptcy court's concern that the LPSC's rate order "elevates" the members' equitable interests and Mabey's assertion that the escrow arrangement "violate[s] the Bankruptcy Code's distribution scheme" by distributing estate assets to members are therefore misplaced. See 11 U.S.C. § 1129(b)(2)(B)(ii); Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership, 119 S. Ct. 1411, 1419-22 (1999).

## E. Summary

In sum, our careful review of the bankruptcy court's opinion and the parties' arguments leads us to the conclusion that the bankruptcy court abused its discretion by enjoining the LPSC from considering a rate decrease based on the suspension of Cajun's interest obligation during the pendency of the bankruptcy proceeding and by terminating the escrow established by the LPSC's rate order. The LPSC carefully crafted its rate order so that it will not infringe on the bankruptcy court's ultimate determination as to whether Cajun's postpetition interest will be

Valley Power Ass'n, 72 F.3d at 1313). For the reasons set forth in the text, however, the characterization of the members' interests as equity interests or debt claims does not affect our analysis in this appeal.

26

discharged, and it has expressed a reasonable concern regarding the appropriateness of Cajun's rates during what has already been a lengthy bankruptcy proceeding.

Mabey, the RUS and the Official Committee of Unsecured Creditors of Cajun have asked the bankruptcy court for an order prohibiting the LPSC from even thinking about a central feature of this (and any other) reorganization proceeding, namely, the suspension of interest payments on prepetition debt. What is reality for everyone else involved in this case is something that the LPSC, charged with protecting the public interest, is to be precluded from considering. This amounts to an order that would prohibit the LPSC from exercising the discretion that it is charged by Louisiana law with exercising. Whatever may be the limits on the LPSC's discretion imposed by the Bankruptcy Code, we see no sufficient basis on this record for the bankruptcy court's injunction or its termination of the escrow. We therefore reverse the district court's order affirming the bankruptcy court's grant of summary judgment in favor of appellees and vacate the injunction.

On appeal to this court,[20] Mabey argues that the escrow account cannot be properly reinstated, however, because the LPSC failed to seek a stay from the district court[21] and, relying on the Louisiana Supreme Court's decision in South Cent. Bell Tel. Co. v. Louisiana Pub. Serv. Comm'n, 594 So. 2d 357 (La. 1992), Mabey asserts that "funds earned by a utility under a set rate are the utility's property until the rate changes, and cannot be taken back." See 594 So. 2d at 359 ("Consequently, the revenues collected under the lawfully imposed rates become the property of the utility and cannot rightfully be made the subject of a refund."). We find these arguments meritless. The amended rate order clearly reduces Cajun's wholesale rate by the interest component, but permits the collection of the interest component in escrow subject to refund, and thus the interest component cannot be said to be part of the "lawfully imposed rate." Cajun's only role with respect to these funds has been to

_____

[20] Mabey stated in his motion to the bankruptcy court seeking a preliminary injunction of the LPSC's consideration of a rate decrease that the LPSC "will suffer no harm if the requested injunction is granted" because "[t]he funds will continue to be deposited into the Excess Funds Account, pursuant to the [bankruptcy court's] Cash Collateral Order. If and when the Court were to determine that Cajun's members are entitled to the Excess Funds, the [funds] could be paid to the members at that time. . . . [T]he LPSC and the Members Committee are not going to and need not lose any right [they] have to recover the alleged overcharges."

[21] We find no support for Mabey's suggestion that the LPSC waived any claim over such disbursed funds by seeking a stay of the bankruptcy court's order terminating the escrow in the bankruptcy court rather than the district court.

28

function as an escrow agent with bare legal title and an exceedingly remote contingent interest.

We therefore remand the case to the district court, and by reference to the bankruptcy court, to reinstate the escrow with the funds that were collected prior to its termination in April 1998, together with those funds that have been collected since that time and those funds that will hereafter be collected pursuant to the amended rate order.

## III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's order affirming the bankruptcy court's grant of summary judgment in favor of appellees, VACATE the injunction, REINSTATE the escrow, and REMAND the case to the district court, and by reference to the bankruptcy court, for further proceedings consistent with this opinion. Costs shall be borne by appellees.