**In re Wesley J. GOFFENA, and Betty L. Goffena, Debtors.**

**Bankruptcy No. 90–11588–7.**

United States Bankruptcy Court,
D. Montana.

Dec. 7, 1994.

Floyd A. Brower, Brower Law Firm, Roundup, MT, for debtors.

Sherry S. Matteucci, U.S. Atty., Jay M. Erickson, Sp. Asst. U.S. Atty., Helena, MT, for U.S. I.R.S.

No appearance for Montana Dept. of Revenue.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

At Butte in said District this 7th day of December, 1994.

In this Chapter 7 case, the Chapter 7 Trustee filed a Motion To Determine Tax Liabilities and payment thereof after sale of an asset by the estate which resulted in substantial federal and state capital gains taxes. The motion is resisted by the U.S. Internal Revenue Service (IRS) and Office of the U.S. Trustee. The Montana Department of Revenue (DOR) has not appeared. A "Stipulation of Facts" by the Chapter 7 Trustee and IRS was filed in anticipation of the hearing set on November 9, 1994. The Trustee and IRS filed short pre-hearing briefs and the Trustee filed a supplemental post-hearing brief. The IRS was granted five (5) days to respond to the post-hearing brief, but did not do so. As will be demonstrated by the discussion in this Order, the case presents a classic procedural morass where certain parties deal with estate property without involving other affected entities.

The stipulated facts are:

Goffenas filed Chapter 7 bankruptcy on October 26, 1990, and a Chapter 7 Trustee was appointed. On the petition date, the Debtors were record owners of a ranch property in Musselshell County, Montana, which was under foreclosure by Farm Credit Bank of Spokane (FCB). The FCB mortgages exceeded $938,000. The real estate, however, had a value of about $436,000, so the property was heavily overencumbered. Neither the IRS nor DOR were scheduled as creditors on the Debtors' bankruptcy Petition.

On December 6, 1990, FCB filed a motion for relief of the automatic stay, setting forth the amount of indebtedness, and stating that summary judgment on foreclosure in state district court, together with appointment of a receiver, was granted on April 1, 1990. I

assume appointment of the receiver put FCB in actual or constructive possession of the property. The Debtors, on December 17, 1990, filed an objection to the motion on the grounds that termination of the stay, with subsequent sale of foreclosure, would result in a substantial capital gain tax of $117,000 to the Debtors, thereby destroying Debtors' "fresh start" under Chapter 7. A preliminary hearing on the motion was held, and then a final hearing scheduled for January 15, 1991. That hearing was continued by stipulation of the Trustee, FCB and the Debtors on the grounds the parties were negotiating an agreement concerning the property which would resolve and settle the matter.[1]

Without any agreement being filed, the Chapter 7 Trustee on March 13, 1991, began the procedural misgivings by filing a "Motion of Trustee to Sell Free and Clear of Third Party Interests" under § 363(f) of the Code to sell the ranch property of the Debtors. The motion stated the Trustee "desires to sell said property free and clear of liens and interests, and to pay from the proceeds costs of real estate taxes for the real estate, vendor's costs of assignments as needed, title insurance, and Trustee's fees as allowed by statute," and then pay the net proceeds to FCB.[2] The Trustee mailed a Notice of Motion to some parties, including FCB, the U.S. Trustee and the Debtors, which gave each party twenty (20) days to object, and if no objection was filed such failure would be deemed a consent to the conditions of sale. No objections were filed and the Court on April 9, 1991, approved the sale free and clear of liens with valid liens to attach to the proceeds of sale. Throughout this period, the IRS and DOR were never served with any of the motions or the notice by FCB, the Debtors, or Trustee.

On May 3, 1991, the Trustee filed a motion for disbursement of the proceeds, showing a

---

1. The so-called agreement attached to the Stipulation of Facts was never executed by the parties and is thus not considered by the Court.

2. It is noted the motion and notice failed totally to take into consideration the very matter which formed the basis of the Debtors' objection to termination of the stay, namely, the large income tax liability arising from the sale.

gross sales price of $436,000 and costs as follows: [3]

|  |  |  |
|---|---|---|
| Musselshell County ad valorem taxes | – | $3,776.36 |
| Title Insurance | – | 1,252.00 |
| Trustee fee | – | 13,260.00 |
| Other costs of closing | – | 385.00 |

Over one year later, on June 28, 1993, the Chapter 7 Trustee filed a "Motion To Determine Tax Liability of Estate." [4] This motion included allegations that the Trustee "has been informed and believes that the sale may have generated a gain" upon which there would "normally" be a tax liability for the bankruptcy estate. But, said the Trustee, there were no funds to pay such taxes, and the Trustee sought an Order to that effect. For the first time in the case, the IRS and DOR were served with the motion, and put on notice of the tax liability. The IRS filed objection, and after hearing, the motion was denied on July 14, 1993, by an Order directing the Trustee to file the required statutory fiduciary tax returns.

The next event occurred over 14 months later, when on September 29, 1994, the Trustee filed a "Motion To Determine Tax Liability of the Estate" seeking relief that the "Trustee be allowed to close the estate without paying any tax liability incurred by the estate for the reason that there are no proceeds in the bankruptcy estate to pay such an administrative claim." The motion states the Trustee per the Court's Order prepared and filed tax returns which show tax liability to the IRS of $73,927 and the DOR of $18,767. Attached to the motion are unsigned and undated fiduciary tax returns. [5] The IRS and the U.S. Trustee objected to the motion.

The IRS's memorandum prays that "the estate's post-petition tax liability and corresponding interest be paid as an administrative expense on a pro rata basis with the estate's other administrative expenses under section 507." The Office of U.S. Trustee takes the same position, but also suggests the secured claim of Musselshell County for such real property taxes should have been subordinated to the administrative claims under 11 U.S.C. §§ 724(b)(2) and 507(a)(1). [6] By happenstance, consistent with the history of this case, neither FCB nor Musselshell County were served with any of the pending motions or objections. [7]

---

**3.** In an affidavit filed by the Chapter 7 Trustee on November 18, 1994, the Trustee set forth a statement of the closing costs which differs from the motion. The closing statement details costs as follows:

| | | |
|---|---|---|
| 1990 taxes, penalty and interest | – | $ 3,895.78 |
| Excess deposit | – | 4,360.00 |
| Proration of 1991 taxes | – | 610.65 |
| Closing fee | – | 200.00 |
| Musselshell Title Company | – | 1,252.00 |
| Funds due FCB | – | 425,681.57 |

There is no mention of the Chapter 7 Trustee fee.

**4.** By this date, all funds had been disbursed, without any income tax return being filed. The plot thickens.

**5.** This is also true of the copy of the returns filed with the Stipulated Facts.

**6.** As no case authority was cited for this argument, this Court disagrees with this position since the real property taxes are a first priority secured claim against the property ahead of the FCB mortgage under Montana law. *In re Granite Lumber Co.*, 63 B.R. 466, 469 (Bankr.D.Mont. 1986), citing *United States v. Christensen, et al.*, 218 F.Supp. 722, 728–29 (D.Mont.1963). In any event, this argument has been abandoned by the parties since it is not raised in post-hearing briefs.

**7.** The Trustee belatedly now confesses the estate liability for the capital gains taxes. I find this tardy position hardly new. The Debtors' objection to the FCB motion for relief of the automatic stay in 1991 raised the specter of a large capital gains tax, but it was obviously ignored by the parties. Indeed, as early as 1983, the case of *In re Lambdin*, 33 B.R. 11, 13 (Bankr.M.D.Tenn. 1983) gave clear insight to problems arising from the sale of property by a Chapter 7 Trustee in holding the estate is liable for such tax, and such tax is an administrative expense under 11 U.S.C. § 503(b)(1)(B), and thus has a first priority along with all other administrative expenses under 11 U.S.C. § 507(a)(1). *Id.* at 12. Equally important on the matter of termination of the automatic stay and abandonment of property of the estate (which could lead to tax liability on foreclosure), courts have interpreted 11 U.S.C. § 554(b) to mean that abandonment should be to the party with superior possessory interest. *In re Perry*, 29 B.R. 787, 793 (D.Md.1983); *In re Cruseturner*, 8 B.R. 581, 591 (Bankr.D.Utah 1981). Thus, the party who has the right to possession at the time of filing of the bankruptcy will reassume the same status when the asset is abandoned or the stay terminated. "Normally this party is the debtor, but it is conceivable that a creditor may be entitled to possession instead if, by exercise of its contractual or other rights, it held a possesso-

None of the briefs filed by the parties get to the crux of the issue presented by the above facts, for none of the parties ever touch upon the application of § 506(c) to the sale as a threshold, but important issue.

This case is at a point where the concededly ill-advised sale by the estate was made with the consent of FCB and the Debtors, albeit without any consideration of or notice to post-petition claims of the IRS and DOR. The consent of FCB was obtained from the notice of sale, which prescribed that FCB must object to the terms of sale, and failing to do so, was tantamount to express consent. I have no doubt FCB and the Trustee had such agreement, even though it was not formalized or filed of record. The reason such consent is important is because of the holding of *Central Bank of Montana v. Cascade Hydraulics and Utility Service, Inc. (In re Cascade Hydraulics and Utility Service, Inc.)*, 815 F.2d 546 (9th Cir.1987). The court there considered the allowance of administrative expenses against the proceeds of sale of the secured parties' collateral. The court held:

> Generally, a debtor's bankruptcy assets are subject to all liens and encumbrances existing when the petition is filed. 3 Collier on Bankruptcy ¶ 507.02(2) (15th ed. 1979). These encumbrances are usually satisfied before disbursement to unsecured creditors. *See generally,* 3 Collier on Bankruptcy ¶ 507.02(2). Administrative expenses or the general costs of reorganization may not generally be charged against secured collateral. *First Western Savings & Loan Association v. Anderson,* 252 F.2d 544, 547 (9th Cir.1958). We allow payment of administrative expenses from the proceeds of secured collateral when incurred primarily for the benefit of the secured creditor or when the secured creditor caused or consented to the expense. *Id.; In the Matter of Trim–X, Inc.,* 695 F.2d 296, 301 (7th Cir.1982).

Congress codified this equitable exception in 11 U.S.C. § 506(c) (1982). *See* S.Rep. No. 989, 95th Cong., 2d, Sess. 68, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5854; H.R.Rep. No. 595, 95th Cong. 1st Sess. 357, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6313 (subsection (c) codifies current law). Section 506(c) now allows "[t]he trustee [to] recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." Under this provision, Cascade must demonstrate that the expenses were (1) reasonable, (2) necessary, and (3) beneficial to Central to recover. § 506(c).

815 F.2d at 548.

■ Stated differently, it is well-settled law that administrative expenses and costs cannot be charged against secured collateral, except as provided in § 506(c). "Section 506(c) was not intended as a substitute for recovery of normal administrative expenses from the debtor's estate." *In re Jenson,* 980 F.2d 1254, 1260 (9th Cir.1992) (citing, *inter alia, Cascade Hydraulics*). While dispute may arise over what are "reasonable" costs and expenses of preserving the property or disposing of the property subject to the lien, as in *Cascade Hydraulics, supra,* that dispute was resolved in the case *sub judice* due to FCB's consent to conditions of sale. The Chapter 7 Trustee's fee was specifically agreed to as an expense of disposing of the secured property. Under normal circumstances that might end the matter, for the result would simply be that FCB as the secured creditor agreed to pay the estate a fee out of its proceeds of sale for disposing of the property.

The problem with stopping at this juncture, and simply closing the estate as a no-asset case, is that it would reward a Chapter 7 Trustee who was charged with knowledge

---

ry interest prior to the filing of the bankruptcy." 8 B.R. at 591. A few courts have found instances where the creditor is the superior party in possession. *In re A.J. Lane & Co., Inc.,* 133 B.R. 264, 268–69 (Bankr.D.Mass.1991); *GMAC v. Bell,* 700 F.2d 1053, 1057–58 (6th Cir.1983). Query: Did FCB have a possessory interest at the

petition date by reason of the decree granting summary judgment and appointing a receiver for FCB? If so, what affect did such right have on capital gains liability? The answers will go forever begging because the status of the case never timely raised such issues.

that the sale was a taxable event, but belatedly fulfilled the Trustee's fiduciary duties to the taxing authorities and the estate. The Trustee surely had to recognize that a substantial tax liability of over $90,000 would not simply dissipate because of lack of notice to the IRS and DOR. The request to disburse the funds before filing the required tax returns, and failing to alert the Court in the motion for disbursal of the substantial tax liability, bodes ill for the Trustee's desire to take a fee of $13,260, with the result that the cupboard is left bare for the IRS and DOR. Indeed, from the facts surrounding the sale, the unsigned tri-part agreement between the Trustee, FCB and the Debtors, the lack of notice to the taxing authorities, the quick request for the disbursal of funds, the dilatory filing of the fiduciary tax returns, all with apparent knowledge that the tax liabilities were projected at the time of sale to exceed $90,000, could easily lead one to conclude that the parties recklessly or negligently attempted to defeat the payment of taxes legally due on sale by leaving the IRS and DOR with no recourse against an insolvent estate.

The Trustee places great, if not sole reliance, on *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir.1993), and that part of the decision (which is consistent with *Cascade Hydraulics*) that "[T]he distribution scheme of section 726 (and, by implication, the priorities of Section 507) does not come into play until all valid liens on property are satisfied". 984 F.2d at 1312. The *SPM* decision continues, that, since the secured creditor after sale of the over-encumbered assets was entitled to receive all of the sale proceeds (they being non-estate assets), "The Code does not govern the rights of creditors to transfer or receive nonestate property", since "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors." *Id.* at 1313. I have no quarrel with these legal positions. *SPM*, however, presents an entirely different set of facts than those in this case.

In *SPM*, the unsecured creditors committee and the secured creditor executed and filed a written agreement for the disposition of the secured collateral with a percentage to

each party, when it became apparent the Chapter 11 reorganization would fail. The agreement was presented to the Bankruptcy Court, which characterized it as a "tax-avoidance" scheme, since the unsecured creditors would be paid some funds, while the IRS priority claim for unpaid pre-petition withholding taxes received nothing, except the right to continue collection efforts against the officers of *SPM*. *Id.* at 1308–09. During the Chapter 11 proceeding, the secured party requested and received the appointment of a receiver to negotiate sale of all of *SPM's* assets. The assets were sold for a sum below the amount of the secured debt under a scenario where a previously entered order went into affect granting the secured creditor relief from the automatic stay, and then converting the case to Chapter 7. Thus, by conversion, the assets had been sold. Following conversion, with all the parties apprised of the committee/secured party agreement, those parties requested distribution pursuant to the terms of the agreement, which the court denied on objection of the Chapter 7 Trustee.

The Circuit Court reversed on the grounds that the entire sale proceeds belonged to the secured creditor as a matter of law and that the unsecured creditor had a right to share its proceeds with other creditors under the bank agreement without paying the IRS or any other priority creditor first. *SPM*, 984 F.2d at 1316, 1318. Therefore, the Chapter 7 Trustee here takes refuge in *SPM*'s holding that the entire funds generated by the Trustee's sale of ranch assets were non-estate assets, which FCB could do with as it desired, including paying a Trustee's fee (which was, of course, based on the statutory allowance fixed under § 326 of the Bankruptcy Code). The holding of *SPM* which the Trustee contends lends credence to the Trustee's position is the following:

Thus, Appellees' argument reduces to contending that although a secured creditor is free to share its proceeds with nonpriority creditors after bankruptcy proceedings have concluded, it may not enter into a contract *during* bankruptcy in which it promises to do the same thing. Again, appellee's argument lacks statutory support for it confuses estate property and

nonestate property. The parties' agreement to share the proceeds could be seen as a partial assignment by Citizens and the general, unsecured creditors of their right to receive bankruptcy dividends.[8] *See* David Gray Carbon, *A Theory of Contractual Debt Subordination and Lien Priorities,* 38 Vand.L.Rev. 975, 996–1004 (1985). A right to receive payment is freely transferrable and assignable in Massachusetts without the consent of the debtor and without affecting the debtor's obligation to pay the underlying debt. . . . [citing authority]. The Agreement did not affect estate property, i.e., the sales proceeds, but only concerned the contracting parties' *claims* against the estate, i.e., their rights to be paid by the estate. We find no support in the Code for banning this type of contractual assignment in all cases. (Emphasis in quote).

*SPM,* 984 F.2d at 1313–44.

The above holding in *SPM* is not applicable to the facts of the case at bar for the simple reason that when FCB abandoned its Motion for Relief of the Automatic Stay (and filed no other Motion seeking abandonment under § 554), the property, i.e., the bank's collateral, remained as property of the estate. The Chapter 7 Trustee is not a creditor of the estate, as was the class represented by the unsecured creditors committee in *SPM.* All of the funds generated by the sale of FCB collateral came into the bankruptcy estate to be distributed according to the provisions of the Bankruptcy Code, including Sections 506(c) and 726. I cannot read *SPM*'s holding as applicable to fixing compensation due a Chapter 7 Trustee under § 326 from estate property, or determining priorities under § 726 of estate property, nor does *SPM* even involve such scenario. I therefore reject the Trustee's argument based on *SPM.*

Rather, I look to the position taken by the bankruptcy court in *In re Swann,* 149 B.R. 137 (Bankr.D.S.D.1993), where the Chapter 7 Trustee disposed of assets of the estate under agreements with secured creditors made pursuant to § 506(c). The sale triggered a federal income tax liability of $6,743.00, which was never paid because the funds were insufficient to pay the tax claim. As to the distribution of proceeds the court concluded:

> Like other courts, this Court reads the various provisions of the Bankruptcy Code as providing for payment of Section 506(c) costs and expenses of a sale out of the proceeds of sale *before* distribution to the secured creditors. [Citing cases.][9] Consistent with the recovery aspect of Section 506(c), recovery or payment of such costs and expenses is done for the benefit of the estate so that the pool of assets available at the time of distribution is enlarged due to the recovery. *In re Interstate Motor Freight System & IMFS, Inc.,* 71 B.R. 741, 745 (Bankr.W.D.Mich.1987).

\*    \*    \*    \*    \*    \*

As to the characterization of the IRS tax claim, case law, legislative history, and the statute itself make it clear that the tax liability incurred by this estate due to the Trustee's sale of real property is not a section 506(c) expense, but, rather, an administrative expense pursuant to Section 503(b)(1)(B), and, thus, it is entitled to priority distribution under section 726. It is also clear that the U.S. Trustee is correct in that Section 726 governs Chapter 7 liquidation distributions.

The Court is aware, however, that after Section 506(c) expense and costs have been "recovered" by surcharging these two secured creditors, there will not be enough proceeds to completely satisfy the two secured claims; therefore, no proceeds will be available for distribution pursuant to

---

8. The court noted at this point in footnote 8, "We do not decide exactly how to categorize the agreement because that issue is not necessary to our decision. *See, infra,* note 13." Footnote 13 states in part, "How to categorize the Agreement is no simple question," as whether it is a partial assignment or a subordination agreement under § 510(a).

9. Earlier in the opinion, the Bankruptcy Court characterized typical § 506(c) expenses as "appraisal fees, auctioneer fees, moving expenses, maintenance and repair costs, and advertising costs." Citing 3 L.King, *Collier on Bankruptcy* ¶ 506.06, at 566–55 (15 Ed.1992). 149 B.R. at 143. Note the absence of a Chapter 7 Trustee fee.

section 726. This means the I.R.S. tax claim will remain unsatisfied.

*Swann,* 149 B.R. at 146.

I hold the Chapter 7 Trustee's fee in this pending case is not a recoverable cost under § 506(c), but rather constitutes an asset of the bankruptcy estate, therein being a significant departure from the facts of *SPM, supra.*

> If the trustee and the secured creditor reached agreement that a surcharge to the creditor [under 506(c)] for the benefit of the estate in the amount of $1,500 is a reasonable charge for those services, I would have no reason to question or disapprove the surcharge.
>
> However, this is a recovery by the trustee *for the estate.* There is no authorization for the trustee to retain this money as his personal compensation. (Emphasis in quote.)

*In re Dinsmore Tire Center, Inc.,* 81 B.R. 136, 138 (Bankr.S.D.Fla.1987).

The secured creditor (FCB) and the Trustee can agree as they may wish to the assignment of FCB's sales proceeds, but that agreement cannot be made contrary to §§ 506(c) and 726. The Trustee's fee was, and is, subject to control by this Court under § 326. It is not an assignment or subordination of FCB sales proceeds to a creditor. Rather, FCB voluntarily placed that sum in the bankruptcy estate to facilitate its interest in a quick sale at a favorable market price, without any further problems from the Debtors. The fee allocated to the Trustee was FCB's payment to the estate for undertaking a chore than could have quite clearly been left to another party upon abandonment or termination of the stay. Having so rewarded the estate (and not the Trustee individually, for the Trustee is a fiduciary for the estate), the sum allocated for the Trustee's fee is property of the bankruptcy estate to be distributed pursuant to § 726.

■ The lien of FCB now having been extinguished, the sum of $13,260 remains for distribution. The Debtor has claimed no exemption in such proceeds, so the entire sum must be utilized to pay expenses of administration and then claims against the estate in accordance with § 726. Under *In re Lambdin,* 33 B.R. 11, 12–13 (Bankr.M.D.Tenn. 1983), and *In re Duby,* 98 B.R. 126, 127 (Bankr.D.R.I.1989), the tax liabilities to the IRS and DOR are administrative expenses under § 503(b)(1)(B), which enjoy a first priority in payment from property of the estate, along with all other administrative expenses, pursuant to 11 U.S.C. § 507(a)(1). As stated in *Duby:* "After paying debtor's exemption, any remaining funds shall be used to pay administrative expenses, including capital gains taxes and Trustee's fees, on a pro rata basis. *In re Lambdin, supra,* [11 B.C.D. 103] at 104, 33 B.R. at 12–13." 98 B.R. at 127–128. At this point I depart from the result reached in *In re Swann, supra,* where the Court did not consider the agreed surcharge for trustee's fees as estate property, 149 B.R. at 141, n. 2, and prorate that sum among the administrative priority creditors.

The fact that the $13,260 was fixed by the FCB and the Trustee on the basis of compensation under § 326 is irrelevant. Whatever the agreement, the sum of $13,260 is now estate property on which the Trustee's fee is computed under § 326, which is $577.80.[10] That sum must be prorated with the post-petition tax claims.

IT IS ORDERED the objection of the IRS to the Trustee's Motion To Determine Tax Liability is sustained; the Trustee's motion is denied, and the Chapter 7 Trustee shall forthwith be disgorged of the fee of $13,260, for payment pro rata of the Trustee's fees and post-petition tax claims of the Internal Revenue Service and Department of Revenue.

IT IS FURTHER ORDERED The Trustee is granted fifteen (15) days to file a final report in accordance with this Order.

---

**10.** Under Section 326, the Trustee in this case is entitled to 15% on the first $1,000 ($150); 6% on the next $2,000 ($120); and 3% on all sums of $3,000 ($307.80), for a total of $577.80.