**In re CGE SHATTUCK, LLC, Debtor.**

**No. 99–12287–JMD.**

United States Bankruptcy Court,
D. New Hampshire.

Sept. 20, 2000.

James Romeyn Davis, Sheldon, Davis & Wells, P.C., A. Davis Whitesell, Cohn & Kelakos LLP, for Banc of America Commercial Finance Corporation.

Bruce A. Harwood, Sheehan, Phinney, Bass & Green, P.A., for debtor.

William S. Gannon, Wadleigh, Starr & Peters, P.L.L.C., for Torrance Family Limited Partnership.

Geraldine Karonis, Manchester, NH, Assistant U.S. Trustee.

## *MEMORANDUM OPINION*

J. MICHAEL DEASY, Bankruptcy Judge.

### I. INTRODUCTION

The Court has before it Banc of America Commercial Finance Corporation f/k/a NationsCredit Commercial Corporation's ("NCC") Amended Proposed Disclosure Regarding NCC Commitment as Alternative to Sixth Amended Joint Plan of Reorganization Dated August 23, 2000 Filed by Debtor and TFLP (the "NCC Disclosure") dated September 5, 2000. The NCC Disclosure describes the terms set forth in a document titled Second Amended and Restated Commitment of NCC To Pay Portion of Collateral Proceeds to Designated Creditors dated September 5, 2000 (the "NCC Commitment").[1] A hearing was

---

1. Both the NCC Disclosure and the NCC Commitment filed on September 6, 2000 were

held on this matter on September 7, 2000 at which time the Court heard the arguments of counsel regarding the proposed NCC Disclosure of the terms of the NCC Commitment. For the reasons stated in open court at the conclusion of the hearing and in this opinion, the Court denied approval of the NCC Disclosure.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

On July 17, 1999, an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against CGE Shattuck, LLC (the "Debtor"). The Debtor's assets consist of a golf course in Jaffrey, New Hampshire, and associated improvements, equipment, infrastructure and easement rights. Just five days later NCC filed five motions seeking stay relief, dismissal of the case, an expedited hearing on the dismissal motion, the posting of a bond, and the appointment of a trustee. After hearings on July 29th and 30th, 1999, the Court denied stay relief, and ordered adequate protection payments in the amount of the monthly real estate tax accruals on NCC's under secured claim. NCC withdrew its motion for appointment of a trustee. The other motions were continued for a hearing. An order for relief in the case was entered by the Court on August 20, 1999. What has since ensued is a case fraught with much contentious litigation, the latest round being the subject of this opinion.

After a three and one-half day evidentiary hearing on NCC's second motion for relief, the Court entered an order denying relief, continuing adequate protection payments, and requiring the Debtor to demonstrate the likelihood of a successful reorganization by filing a plan and disclosure statement by a date certain or stay relief would be granted to NCC. The Debtor and Torrance Family Limited Partnership ("TFLP") filed an amended joint plan and disclosure statement.[2] On March 9, 2000 the Debtor and TFLP filed an amended joint plan and a disclosure statement. Based upon its belief that the amended joint plan was not confirmable and to maximize the value of the Debtor's golf course assets, NCC filed NCC's Liquidation Plan dated March 22, 2000 and a disclosure statement. The plan classified unsecured creditors into a class of general unsecured claims and a junior class consisting of the unsecured claims of members of the Debtor, insiders, and others who loaned money to the Debtor and were deemed by NCC to be insiders. This first NCC plan provided for the sale of the Debtor's assets at an auction, with NCC having the right to credit bid its claim, for payment of administrative claims (up to $100,000.00), payment of priority tax and real estate tax claims, and a 17% dividend (up to an aggregate total of $68,000.00) to non-insider, non-member, unsecured creditors in the senior unsecured class.

NCC's Amended Liquidating Plan dated June 23, 2000, and associated disclosure statement, were filed three months later. The amended plan classified all unsecured creditors in the same class, except for creditors whose claims were subordinated under § 510 of the Bankruptcy Code. NCC did not identify the subordinated creditors in either the plan or disclosure statement, but it appeared to include only the unse-

---

amended version of similar documents dated August 23, 2000 and filed pursuant to the Court's procedural ruling regarding submission of amended disclosure statements and plans by NCC and the proponents of a joint plan of reorganization by the debtor and TFLP.

**2.** The Debtor and TFLP had filed their first joint plan on November 22, 1999, but did not file a disclosure statement. The filing appeared to be a part of the Debtor's defense to NCC's motion for relief.

cured claims of members of the Debtor. The amended plan provided for the transfer of the Debtor's assets to NCC, the release of NCC by the Debtor, payment of administrative expenses, priority tax and real estate tax claims, and payment of a maximum aggregate dividend to the class of general unsecured creditors of $100,000.00. The amended disclosure statement stated that due to the size of the claims in this class, the effective dividend would be less than two percent. NCC would be obligated to lend to a creditors' trustee the sums necessary to make all plan payments and post-confirmation expenses. The loan would carry interest at the rate of eight percent and, to the extent that sufficient funds were not on hand at the closing of the case, the loan would be forgiven. The amended disclosure statement also disclosed that pursuant to a separate commitment to be filed, NCC was undertaking to pay a limited number of the general unsecured creditors (the "Designated Creditors") the difference between the dividend under the amended plan and fifty percent of their allowed claims. Sixteen creditors holding claims totaling $139,561.16 were included on NCC's list of Designated Creditors. It appeared that the list of Designated Creditors was some, but not all, of the general unsecured creditors in the class of non-insider, non-member, general unsecured creditor class in NCC's first plan and the amended plan. Under the first plan, that class was to receive a 17% dividend up to an aggregate maximum of $68,000.00. Under the terms of the amended plan and the commitment, they would receive a fifty percent dividend, which, after accounting for a small dividend under the plan, would result in an NCC aggregate payment under the commitment of approximately $67,000.00.[3] The commitment was filed on August 4, 2000. Under its terms, the 50% dividend was to be paid upon the sale of the Debtor's property by NCC if either the amended plan was confirmed, NCC received stay relief, or the case was converted on or before October 20, 2000.

On August 7, 2000 the Court held a hearing on objections to NCC's amended disclosure statement and the disclosure statement for the amended joint plan filed by the Debtor and TFLP. At that hearing the Court dealt with all objections to the two disclosure statements and questioned whether the NCC amended plan and the commitment were permissible or whether the payment of an extra dividend to some, but not all, unsecured creditors in the general unsecured creditor class violated the classification and non-discrimination requirements of Chapter 11 of the Bankruptcy Code. The Court indicated that the question of the amended plan's compliance with Chapter 11 was a confirmation issue and would be addressed if NCC proceeded with confirmation of the amended plan. The Court set August 23, 2000 as the deadline for NCC and TFLP to file amended disclosure statements.

On August 23, 2000, TFLP filed the Sixth Amended Chapter 11 Plan dated August 23, 2000 (the "TFLP Plan") and an accompanying disclosure statement. NCC filed a notice of withdrawal of its amended plan together with an amended and restated commitment to pay a portion of collateral proceeds to the Designated Creditors and a proposed disclosure regarding the amended commitment. On September 6, 2000 NCC, filed a document titled, Second Amended and Restated Commitment of NCC to Pay Portion of Collateral Proceeds to Designated Creditors (the "NCC Commitment"). The NCC Commitment called for a 50% dividend payment (based upon claims) (the "NCC Dividend") to certain creditors of the Debtor provided that on or before November 10, 2000 NCC was either granted relief from the automatic stay or the case was converted to Chapter 7 (the "NCC Re-

---

3. The payment of $67,000.00 under the commitment was in addition to the $100,000.00 to be paid pro rata to all non-subordinated unsecured creditors under the NCC amended plan.

quested Relief"). While the NCC Dividend was not conditioned upon the Designated Creditors voting to reject the TFLP Plan, the Court notes that it was clearly NCC's intent to induce the Designated Creditors to reject the TFLP Plan in favor of the NCC Dividend. NCC then sought this Court's approval of the NCC Disclosure, which NCC wanted to send out in the same packet as the TFLP Plan.

The NCC Disclosure contains a summary of the disclosure itself, a summary of the NCC Commitment, a list of the names of and amounts of claims held by the Designated Creditors, the timing of the payment of the NCC Dividend, and the advantages of the NCC Commitment over the TFLP Plan followed by a separate section titled "Importance of Voting to REJECT the [TFLP] Plan" which states:

> Because the NCC Dividend will be made only if NCC is granted the NCC Requested Relief, and will not be made if the [TFLP] Plan is confirmed, NCC strongly urges all Designated Creditors to vote to REJECT the [TFLP] Plan. Voting to REJECT the [TFLP] Plan will increase the likelihood that the [TFLP] Plan will not be confirmed, and denial of confirmation of the [TFLP] Plan will greatly increase the likelihood that NCC will be granted the NCC Requested Relief and will pay the 50 percent NCC Dividend to Designated Creditors.

The NCC Disclosure then continues with a section describing the conditions to payment of the NCC Dividend, how to vote to reject the TFLP Plan, and concludes with the following paragraph:

> In order to increase the likelihood that the [TFLP] Plan will not be confirmed, and that the NCC Dividend will be paid, NCC strongly urges all Designated Creditors to vote to Reject the [TFLP] Plan.

4. The NCC Commitment and accompanying NCC Disclosure were not filed or proposed to be circulated during the exclusive time period given to Debtor under 11 U.S.C. § 1121(b) of

At the conclusion of the hearing on September 7, 2000, the Court denied approval of the NCC Disclosure.

## III. DISCUSSION

In support of its NCC Disclosure, NCC submitted a Memorandum of Law and presented arguments at the hearing on September 7, 2000. NCC takes the position that (1) the NCC Commitment and accompanying NCC Disclosure are proper and do not contravene the Bankruptcy Code; and (2) the NCC Disclosure is necessary and appropriate for creditors to make an informed voting decision on the TFLP Plan. The proponents of the TFLP Plan objected to the NCC Commitment and approval of the NCC Disclosure on the grounds that (1) the NCC Commitment and NCC Disclosure are contrary to the provisions of Chapter 11; (2) the classification of creditors as "Designated Creditors" by NCC was arbitrary and capricious; (3) the NCC Commitment is an attempt to purchase claims on credit or for an illusory promise in violation of Chapter 11 and the Bankruptcy Rules; and (4) the First Circuit's decision in *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir.1993), does not condone or allow distributions outside of a plan in the solicitation or rejection of a Chapter 11 plan.

### 1. The Propriety of the NCC Commitment and NCC Disclosure Under the Bankruptcy Code.

NCC contends that no provision of the Bankruptcy Code specifically prohibits the NCC Commitment and cites several bankruptcy decisions which it contends are applicable and support the propriety of the NCC Commitment. The Court has examined these cases and does not find them persuasive for the reasons discussed below.[4]

the Bankruptcy Code to file and pursue confirmation of a plan of reorganization. Accordingly, unlike the decision in *In re Clamp-All Corp.*, 233 B.R. 198 (Bankr.D.Mass.1999),

■ NCC contends that the NCC Commitment is nothing more or less than NCC's undertaking to share proceeds of its collateral in the event that NCC is permitted to realize upon such collateral in a timely manner, as defined in the NCC Commitment. The label placed upon its proposal by NCC is not dispositive of the question of the legal nature or the propriety of the NCC Commitment any more than calling a transaction a "lease" renders it immune to a determination that it is a financing transaction, not a lease. *See Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co., Inc.)*, 839 F.2d 203, 209 (4th Cir.1988), *cert. denied*, 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 936 (1988) (holding that whether a putative lease actually represents a security agreement depends upon the intent of the parties measured as an objective standard based upon the relationships and economic realities created by the agreement); *Chicoine v. OMNE Partners II (In re OMNE Partners II)*, 67 B.R. 793 (Bankr.D.N.H. 1986) (holding that a bankruptcy court, as a court of equity, may "look through form to substance" in determining the true nature of a transaction) (citing *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)). It is the substance of the NCC Commitment, not the label used by NCC, that determines the true nature of the proposal. NCC is seeking Court approval to solicit votes against the TFLP Plan, while unilaterally offering to pay a 50 % dividend on claims to some, but not all, non-insider general unsecured creditors. In substance, the NCC Commitment is a proposal to make a distribution on account of claims to certain unsecured creditors if NCC obtains the opportunity to liquidate the property of the bankruptcy estate. Such a scheme is not only similar to terms of a typical liquidating plan of reorganization which might be filed by any secured creditor, but is also strikingly similar to terms of the NCC amended plan which was withdrawn by NCC.

violation of exclusivity is not an issue in this

NCC contends that the NCC Commitment is not a plan of reorganization and not a plan of liquidation. Rather, NCC argues that the NCC Commitment "is an undertaking by NCC to pay certain creditors a portion of the proceeds of NCC's collateral, should NCC be permitted to liquidate its collateral. The NCC Commitment is no more a 'plan' than is a Chapter 7 liquidation or the grant of relief from stay to a secured creditor holding liens against all estate property." *See* Memorandum in Support of Dissemination of Disclosure Regarding NCC Commitment to Creditors as part of Plan Solicitation Materials (the "NCC Memorandum") at 3–4. The Court disagrees. The NCC Commitment is a unilateral offer by a party in interest to make a distribution to creditors on account of their claims, from assets of the proponent, subject to the occurrence of stated contingencies. Similarly, a plan of reorganization is a unilateral offer by a party in interest (which becomes binding only upon confirmation) to make a distribution to creditors from assets which may be contributed in whole or in part by the plan proponent, and is subject to one or more conditions and subsequent actions by the bankruptcy court, including entry of a confirmation order. However, unlike a plan of reorganization, the NCC Commitment is not subject to the limitations and requirements of Chapter 11, including the requirements for classification of claims (11 U.S.C. § 1122), the uniformity of treatment in members of the same class (11 U.S.C. § 1123(a)(4)), or the requirements for confirmation (11 U.S.C. § 1129).

Notwithstanding the similarity of the NCC Commitment to a plan of reorganization, NCC points to the First Circuit's decision in *In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir.1993), for authority, and entitlement, to dispose of the proceeds of its collateral in any manner that it chooses. While the court in *SPM* did allow a creditor to dispose of its collateral without interference from the bankruptcy court, this

case.

Court finds that *SPM* is factually different than the case at hand. In *SPM* there was a bilateral agreement between a secured creditor and the unsecured creditors committee. *Id.* at 1308. The agreement specifically called for the parties to work together towards replacing the debtor's CEO, formulating a joint plan, and working cooperatively to maximize the liquidation value of the debtor and provide some return to the general, unsecured creditors. *Id.*

In the instant case, there is no formally executed agreement, nor are the parties working towards formulating a joint plan. The NCC Commitment is a unilateral offer by NCC. While NCC seeks to solicit the cooperation of the Designated Creditors in defeating the TFLP Plan, no such creditor has agreed to cooperate and, in fact, cooperation is not necessary in order for a Designated Creditor to qualify to receive the NCC Dividend. Even if every Designated Creditor voted in favor of the TFLP Plan, they would qualify to receive the NCC Dividend if the TFLP Plan is not confirmed and NCC receives the relief described in the NCC Commitment by the date set forth therein.

Even assuming that the differences between the facts of *SPM* and this case are not pertinent, the decision in *SPM* is not authority for the proposition that parties in a bankruptcy proceeding may avoid the requirements of the Bankruptcy Code by private agreement. *See In re Scott Cable Communications, Inc.*, 227 B.R. 596, 603 (Bankr.D.Conn.1998) (holding that *SPM* does not permit a Chapter 11 plan proponent to avoid the confirmation requirements of § 1129 of the Bankruptcy Code); *In re Goffena*, 175 B.R. 386, 390–92 (Bankr.D.Mont.1994) (holding that *SPM* does not permit a Chapter 7 trustee to avoid the distribution requirements of §§ 506(c) and 726 of the Bankruptcy Code through a private agreement with a secured creditor). Further, it appears to this Court that the NCC Commitment, if permissible, would create an end-run around the First Circuit's decision in *Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 748 F.2d 42 (1st Cir.1984). In *Granada Wines*, the court specifically held that "all creditors of equal rank with claims against the same property should be placed in the same class." *Id.* at 46 (citations omitted). While NCC claims that the NCC Commitment is not a plan, as was noted above, the economic substance and effect of the NCC Commitment would be to sanction a distribution scheme that discriminates between creditors in the same class. Such discrimination would not be allowed under a plan of reorganization by virtue of the provisions of 11 U.S.C. § 1123(a)(4) and the holding of *Granada Wines*. If a plan opponent were permitted to use the promise of a discriminatory distribution on account of an allowed claim to obtain votes against a plan of reorganization, then presumably a plan proponent could use a similar scheme to secure votes in favor of a plan. This Court will not allow opponents or proponents of a plan of reorganization to use creative drafting to circumvent the requirements of Chapter 11 of the Bankruptcy Code or controlling case law within this circuit.

NCC also seeks to justify its proposal to make distributions to some, but not all creditors, by pointing to *In re Waterville Valley Town Square Assocs.*, 208 B.R. 90 (Bankr.D.N.H.1997) (holding that votes were not disqualified under 11 U.S.C. § 1126(e) where a creditor did not purchase the claims of all unsecured creditors). While the Court agrees that NCC could purchase some, but not all the claims in a class, NCC is not buying claims. NCC itself admits that the NCC Commitment it is not an offer to buy claims. *See* NCC Memorandum at 5. Accordingly, the holding in *Waterville Valley* is not pertinent to the issue that is now before the Court.

Finally, NCC suggests that the payment of the NCC Dividend to certain creditors is appropriate under the case law set out

in *Mabey v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503 (5th Cir.1998). Specifically, NCC cites *Cajun* for the proposition that the NCC Commitment does not have to "comply with the procedural and substantive protections for Chapter 11 plans" because the NCC Commitment is not a plan. *See* NCC Memorandum at 4. While the court in *Cajun* did hold that payments to creditors from non-estate assets were permitted and that the non-discrimination provisions of the Bankruptcy Code were not applicable to such payments, *Cajun* involved a different type of payment than the one at issue in the case at hand. *See Cajun*, 150 F.3d at 518. The payments at issue in *Cajun* involved the payment of the legal fees and expenses incurred by creditors. *Id.* at 507. In rendering its decision the court specifically pointed to the fact that the payments were not in any way related to the claims of the creditors. *Id.* at 518–19. Furthermore, the agreement to pay the expenses had been reached after the votes on the plan had already been cast and submitted by the creditors. *Id.* at 511. This Court, therefore, finds *Cajun* unpersuasive in this case where the payments are related to the claims of the creditors and are being offered before votes are cast on the TFLP plan.

 NCC is attempting to justify the terms of the NCC Commitment by comparing elements of the proposal and some of the impacts of the proposal to procedures and actions that are permitted under the Bankruptcy Code or previous court decisions. However, the fact that one or more, or even all, of the provisions of the NCC Commitment are permissible under the Bankruptcy Code, does not prevent the Court from examining the substance of the NCC Commitment and the impact on the solicitation of votes in this Chapter 11 proceeding and the Chapter 11 plan process itself. After notice and a hearing, a debtor may sell, use, or lease property of the estate outside the ordinary course of business. *See* 11 U.S.C. § 363(b)(1).

However, a debtor may not use the provisions of § 363 to deny creditors the protections they would receive under Chapter 11 if the transaction were part of a plan of reorganization. *See In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227 (5th Cir. 1986) (holding that proposed leases constituted a creeping plan of reorganization which was incompatible with the requirements of the *Braniff* decision); *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir.1983) (holding that debtor may not use § 363 to sidestep the protection creditors have when it comes time to confirm a plan of reorganization); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir.1983) (resolving the apparent conflict between Chapter 11 and § 363 by requiring evidence to justify an express finding of good business reasons to authorize a sale outside of a Chapter 11 plan). The closer a proposed transaction gets to the heart of the reorganization process, the greater scrutiny the Court must give to that matter. *See In re New Hampshire Elec. Coop., Inc.*, 131 B.R. 249, 252 (Bankr. D.N.H.1991) (denying a motion to change power supplier outside of a plan and approved disclosure statement). The degree of Court scrutiny of proposed transactions under § 363 must be elastic—becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process. *In re Public Serv. Co. of New Hampshire*, 90 B.R. 575, 582 (Bankr.D.N.H.1988) (denying approval to transfer management and operational control of a nuclear power plant outside of the ordinary course of business).

The Court finds that at this point in this Chapter 11 proceeding the NCC Commitment and NCC Disclosure are being offered by NCC as a proxy for a competing plan of reorganization without the need to comply with the requirements of Chapter 11. *See e.g.*, 11 U.S.C. § 1122 (classification of claims), § 1123(a)(4) (uniform treatment of all claims within the same class), § 1126 (acceptance of plan) and § 1129(a)(7) (best interest of creditors test). If the NCC Commitment is not a plan of reorganization, the NCC Commit-

ment does not have to comply with the requirements for a Chapter 11 plan of reorganization. In effect, by withdrawing the NCC amended plan, and making minor changes to the NCC Commitment, NCC seeks to obtain for itself the economic benefits of the withdrawn plan without complying with the requirements for confirming a Chapter 11 plan of reorganization. The provisions of Chapter 11 of the Bankruptcy Code are intended to provide for the orderly reorganization, including liquidation, of Chapter 11 debtors while providing for protection of creditors. The Court will not approve the terms of the NCC Commitment and accompanying NCC Disclosure and permit NCC to end run the provisions and purposes of Chapter 11 of the Bankruptcy Code.

### 2. The Necessity and Appropriateness of the NCC Disclosure to Creditors Voting on the TFLP Plan.

■ Citing *In re Apex Oil*, 111 B.R. 245 (Bankr.E.D.Mo.1990), NCC contends that creditors are allowed to send out information incident to the solicitation of votes on a plan without approval of the court. In further fleshing out the holding of *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94 (3rd Cir.1988), the court in *Apex Oil* held that "a soliciting party may react to and present contrary views regarding the court-approved disclosure statement, but may not present or suggest an alternative plan that has not been subject to court scrutiny regarding adequacy of disclosure." *Apex Oil*, 111 B.R. at 250. The court also held that it would not allow a party to use such communications to circumvent the Bankruptcy Code by suggesting an alternative plan that had not been approved by the court. *See Id.* at 249. In offering examples of the types of solicitations that were permissible to send out without prior court approval, the court listed such things as narratives or conclu-

sions that were contrary to those expressed in the plan, expressing positions or conclusions that were not contained in the plan, or alternative liquidation analysis.[5] *See Id.* at 250.

While *Apex Oil* and *Century Glove* stand for the proposition that creditors may communicate with each other regarding a court approved disclosure statement, these cases are not applicable in the matter before the Court, as that is not what NCC has done in this case. As noted above, NCC's Commitment is a de facto plan of reorganization that does not meet the requirements of Chapter 11 of the Bankruptcy Code. The NCC Disclosure does not simply point out the flaws of TFLP's plan, it proposes an alternate plan of reorganization. While NCC is free to communicate with other creditors seeking rejections of the TFLP Plan, it may not circulate a de facto plan, in the form of the NCC Commitment, that does not meet the requirements of Chapter 11, or use the NCC Disclosure to solicit rejection of the TFLP Plan.

## IV. CONCLUSION

The Court finds that by approving the NCC Disclosure the Court would be sanctioning the terms of the NCC Commitment which would permit NCC to do an end-run around both *Granada Wines* and the provisions of Chapter 11 of the Bankruptcy Code. Therefore, the Court denies approval of the NCC Disclosure. Pursuant to Federal Rule of Bankruptcy Procedure 8002(c)(1) the time for filing a notice of appeal from this decision shall run from the date of this opinion. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

---

**5.** The court in *Apex Oil* further stated that although court approval was not needed prior to sending out additional information to creditors that was not contained in a court ap-

proved disclosure statement, persons doing so did so at their own peril. *See Apex Oil*, 111 B.R. at 249.